**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------×

GREGORY TEACHEY,

               *Plaintiff,*

        *v.*

EQUINOX HOLDINGS INC.,

               *Defendant.*

-------------------------------------------------------------------------×

**18 CV 10740**

---

### PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

Edgar M. Rivera
THE LIDDLE LAW FIRM PLLC
1177 Avenue of the Americas, 5th Floor
New York, NY  10036
Office Tel: 646-452-7211
Mobile Tel: 646-400-2249

*Attorneys for Plaintiff*

**PRELIMINARY STATEMENT**

Defendant Equinox Holdings, Inc. ("Equinox") reached out to have Plaintiff Gregory Teachey apply for a management position. Excited for the opportunity, he did, but was hired as a Front Desk Associate at the age of 50; a position for which the average age at Equinox is 27. Equinox's significantly younger management, who were in there 20s and 30s—did not believe that Mr. Teachey belonged at Equinox because of his age. They made fun of him in front of and behind his back, telling him that he was "old as fuck," "ancient," and a "dinosaur." Managers explicitly said that he was only hired because Equinox had been momentarily short staffed and that he would not have been hired otherwise.

Rather than give Mr. Teachey a fair chance to keep his job and move up with Equinox, management instead set him up to fail. Equinox put Mr. Teachey on a final write up for a single and first-instance violation of the company dress code simply because he did not wear an Equinox t-shirt during an emergency, and summarily terminated him after claiming he violated the so-called guest policy on a single instance. Equinox, however, has no record *of every discipling, let alone terminating,* any younger employee for any violation of their dress code or guest policies.

Equinox now moves for summary judgment. This motion must fail, as Mr. Teachey has provided sufficient evidence from which a reasonable juror could conclude that his age was the reason for his termination. Accordingly, the Court should deny Defendant's motion.

**FACTS**

### I. Background

Mr. Teachey was born in 1966. (Teachey Decl. ¶ 3.) In December 2016, Cathe Thompson, a Group Fitness Manager at Equinox's 817 Lexington Ave., New York, New York 10065 location (the "East 63rd Street Location"), wanted to bring Mr. Teachey on board to work at Equinox as a

Front Desk Manager on Duty.  (*Id.* ¶ 4.)  In and around January or February 2017, Mr. Teachey submitted an application to Equinox.  (*Id.* ¶ 6.)  Mr. Teachey was interviewed by Ms. Thompson; Linda Bonilla, Assistant Spa Manager; an unknown individual working as a Front Desk Manager on Duty; Craig Hook, General Manager; Leo Mongiovi, Assistant General Manager; and Jonathan Rivera, Assistant General Manager.  (*Id.* ¶ 7.)  During the interviews, they discussed Mr. Teachey being hired as a Front Desk Manager on Duty.  (*Id.* ¶ 8.)  In and around February 2017, Mr. Mongiovi offered Mr. Teachey the position of Front Desk Manager on Duty at Equinox's 330 East 61st Street, New York, New York 10065 location (the "East 61st Street Location"), which he accepted.  (*Id.* ¶ 9.)

On or about February 27, 2017, when Mr. Teachey arrived for his first day, however, Mr. Mongiovi could not find an Equinox shirt for him to wear.  (*Id.* ¶ 10.) Mr. Teachey asked Mr. Mongiovi why Mr. Teachey would need to wear one, since managers at Equinox do not wear an Equinox uniform.  (*Id.* ¶ 11.) Mr. Mongiovi, for the first time, told Mr. Teachey that he was not hired to be a Manager on Duty but as a Front Desk Associate.  (*Id.* ¶ 12.)  A Front Desk Manager on Duty basically oversees all of the Front Desk Associates and when a General Manager or Assistant General Manager is not there, the Front Desk Manager acts as the General Manager.  (*Id.* ¶ 13.) Essentially, it is the next step to be promoted to Assistant General Manager.  (*Id.*)

Mr. Mongiovi told Mr. Teachey that Mr. Teachey was replacing Nazli Gerami, a Front Desk Associate, who had been promoted to Membership Associate.  (*Id.* ¶ 14.)  Ms. Gerami confirmed that Mr. Teacehy was replacing her.  (*Id.* ¶ 15.)  The ages of Front Desk Associates, with the exception of Mr. Teachey, ranged from early 20s to early 30s, with 10 to 11 (out of 12) associates between the ages of 22 and 24. (Shkreli Decl. ¶ 5.)  Mr. Teachey was, by far, the oldest Front Desk Associate at age 50.  (*Id.* ¶ 6.)  Indeed, the average age of Equinox's Front Desk

Associates at its East 61st Street and East 63rd Street Locations was 27 years old.  (Rivera Decl. ¶¶ 9-10, Ex. 7, Ages of Front Desk Associates.)  Of the 110 Front Desk Associates, 83 were in their 20s, 24 in their 30s, 2 in their 40s, and 1 (Mr. Teachey) in his 50s.  (*Id.* ¶¶ 9-10, Ex. 7.)

In May 2017, Mr. Teachey also began working at the East 63rd Street Location as a Spa Desk Associate in addition to the East 61st Street Location.  (Teachey Decl. ¶ 17.) The East 63rd Street Location had a spa, in which Equinox offered facials and massages.  (*Id.* ¶ 18.)

## II.  Age discrimination

During onboarding process with Mr. Mongiovi, who was in his 20s at the time, when the computer prompted Mr. Teachey to change his password, his birthdate, appeared on the screen. (*Id.* ¶ 25; Rivera Decl. ¶ 11, Ex. 8, Ages of All Employees at Locations.)  Mr. Mongiovi then commented, "Oh, that's your birthday.  I see you're 50." (Teachey Decl. ¶ 26.) Mr. Mongiovi left the room and, within a few minutes, he and Kyle Eckert, Membership Advisor, passed by the door, looked in at Mr. Teachey, and both began laughing.  (*Id.* ¶ 27.)   Mr. Teachey heard Mr. Eckert say to Mr. Mongiovi, "He's an old queen."  (*Id.)*

Mr. Mongiovi told Mr. Teachey that Mr. Hook had asked him, after they had hired Mr. Teachey, why Mr. Mongiovi had hired somebody so old as a Front Desk Associate, and that Mr. Teachey was too old to be at the front desk.  (*Id.* ¶ 28.)

In and around March 2017, Mr. Rivera, who was in his 20s at the time, told Mr. Teachey that Equinox had only hired Mr. Teachey because, at the time of his application, Equinox was desperate for front desk associates and, absent these circumstances, Equinox would never have hired him because of his age.  (*Id.* ¶ 29; Rivera Decl. ¶ 11, Ex. 8.)  Mr. Rivera further clarified, stating, "Equinox needed to replace someone right away," and, "would have taken almost anybody," adding, "We've never had someone as old as you at the front desk."  (*Id.* ¶ 30.)  Mr.

Rivera stressed that Equinox really would not have hired Mr. Teachey if they had not been so desperate.  (*Id.* ¶ 30.)  One of Mr. Teachey's coworkers, Jennifer Hardy, Front Desk Associate, was present during this conversation and asked Mr. Teachey directly how old he was.  (*Id.* ¶ 301.)  When Mr. Teachey did not respond, Mr. Rivera spoke up and said, "He's like 50."  (*Id.* ¶ 31.) Mr. Rivera then said that Mr. Hooks had told him, in reference to Mr. Teachey, "I don't know about this guy, he seems a little too old for the front desk," and asked, "Why has he not moved above manager on duty for his age?"  (*Id.* ¶ 32.)  Mr. Rivera then added that Mr. Teachey was the oldest Front Desk Associate he had met.  (Teachey Decl. ¶ 33.)

Mr. Mongiovi referred to Gregory Teachey as "ancient," "so fucking old," and a "dinosaur."  (Shkreli Decl. ¶ 20.)  Mr. Mongiovi frequently told Mr. Teachey that Mr. Teachey was too old to be working at the front desk, and made snide comments like, "What do you want to do when you grow up?" (Teachey Decl. ¶ 35.)  On or about June 1, 2017, Mr. Mongiovi compared Mr. Teachey to Mr. Hooks, specifically stating, "Craig is five years younger than Gregory but looks ten years older."  (*Id.* ¶ 36.) Mr. Mongiovi also told other Equinox employees Mr. Teachey's age.  (Shkreli Decl. ¶ 20.)

In September 2017, Equinox terminated Mr. Hooks and replaced him with Adam Gecht, acting General Manager, who became Mr. Teachey's direct supervisor.  (Teachey Decl. ¶ 37.)  Mr. Gecht was also the Regional Director.  He was 10 years younger than Mr. Teachey.  (Rivera Decl. ¶ 11, Ex. 8.)  Mr. Gecht treated Mr. Teachey worse because of his age.  (Teachey Decl. ¶ 38.)  For example, Mr. Gecht screamed at him, "You're too fucking old. Aren't you like 50? You shouldn't be fucking up like this at the front desk. What is your fucking problem?" when he was angry with Mr. Teachey.  (*Id.* ¶ 39.)

Ms. Arias asked Mr. Teachey nearly every day about his age to the point Mr. Teachey had to ask her to stop. (*Id.* ¶ 40.) Ms. Arias not only asked Mr. Teachey repeatedly, but also repeatedly told him that all his coworkers were talking about him being "old as fuck." (*Id.* ¶ 40.) Alexis Warren, Membership Advisor, made jokes about Mr. Teachey's age, calling him "ancient" and referring to him as a "dinosaur." (Shkreli Decl. ¶ 21.) Mr. Eckert, and Mr. Mongiovi would laugh at Mr. Teachey after exchanging offensive comments about his age. (*Id.* ¶ 22.)

On several occasions, a Michael Stedman, Assistant General Manager at the East 63rd Street Location, asked Mr. Teachey's age in front of coworkers. (Teachey Decl. ¶ 41.) When Mr. Teachey did not answer, he said he already knew Mr. Teachey was 50, as he had actually looked up Mr. Teachey on the Equinox profiles. (*Id.* ¶ 41.) He often asked Mr. Teachey if he thought he was too old for such a job. (*Id.* ¶ 41.)

In January 2018, a client came in right at closing time, Equinox could not fit her in, and she screamed, "Fucking fit me in, I'm a fucking good client here. You know, you're just too goddamned old. What's wrong with you?" (*Id.* ¶ 46.) Mr. Teachey reported her conduct to Ms. Bonilla and to Gianna Lobuono, the Spa Manager, the very next day. (*Id.* ¶ 47.) Mr. Teachey specifically said that the client had come in drunk and was very insulting, specifically saying that the client called him "too goddamned old." (*Id.* ¶ 48.) Both Ms. Bonilla, who was in her 20s, and Ms. Lobuono, who was in her 40s only responded that she was a very good client, and Mr. Teachey will have to overlook her. (*Id.* ¶ 49; Rivera Decl. ¶ 11, Ex. 8.)

In and around late January or early February 2018—about a week before Mr. Teachey's termination—Mr. Teachey's coworkers, Alexis Warren, Membership Advisor, and Carly Arias, Front Desk Associate, who was in her 20s, were speaking with him. (*Id.* ¶ 50; Rivera Decl. ¶ 11, Ex. 8.) Ms. Arias asked Ms. Warren to guess how old Mr. Teachey was, to which Ms. Warren

correctly guessed 50.  (*Id.* ¶ 51.) Ms. Arias, surprised, asked Ms. Warren how she knew.  (*Id.* ¶ 51.)  Ms. Warren had responded that Mr. Mongiovi had told her.  (*Id.* ¶ 51.)  Ms. Arias then informed Mr. Teachey that Mr. Mongiovi and Mr. Eckert often refer to him as "ancient," "old as fuck," and a "dinosaur." (*Id.* ¶ 52.) Ms. Arias told Mr. Teachey that Mr. Mongiovi and Mr. Eckert told her that Mr. Teachey was too old for the front desk job because he did not fit in with his younger coworkers, and that some members had commented that Mr. Teachey looked a little old to be behind the front desk.  (*Id.* ¶ 53.)

### III. Other instances of discrimination by decisionmakers

Darnell Serrette, Assistant General Manager, who was in his 30s, shared inappropriate comments about his sex life, such as, "You saw that guy that just came in? I had sex with him." (Shkreli Decl. ¶ 9; Rivera Decl. ¶ 11, Ex. 8.)  Mr. Serrette would also show explicit pictures and videos of porn stars and current Equinox members during work hours.  (Shkreli Decl. ¶ 10.)  When Michael Shkreli, Front Desk Associate, who was in his 20s, was sexually assaulted by a male Equinox member, he reported it to Mr. Serrette.  (*Id.* ¶ 11.)  In response, Mr. Serrette told him, "He's a great guy and he bought me chocolate," in reference to the Equinox member that assaulted Mr. Shkreli.  (*Id.* ¶ 12.)  The member was still allowed on the premises and continued to use the facilities.  (*Id.* ¶ 13.)

Mr. Mongiovi also behaved inappropriately.  (*Id.* ¶ 7.) After interviewing candidates for positions with Equinox, Mr. Mongiovi often made comments like, "I want to fuck the shit out of him," referring to the male interviewees.  (*Id.* ¶ 14.)  Mr. Mongiovi would also make sexual comments about Equinox members who frequented the gym.  (*Id.* ¶ 15.)  On two occasions, Mr. Mongiovi touched Mr. Shkreli inappropriately.  (*Id.* ¶ 16.)  On the first occasion, with Mr. Teachey and James Campbell, Front Desk Associate present, Mr. Mongiovi grabbed Mr. Shkreli's buttocks

with both of his hands. (*Id.* ¶ 17.) On the second occasion, with Nicolette Gibbons present, Mr. Mongiovi put his hands on Mr. Shkreli's waist to move him out of a computer area. (Shkreli Decl. ¶ 18.) Mr. Mongiovi unnecessarily held onto Mr. Shkreli's waist for too long, and it was inappropriate and unwanted. (*Id.* ¶ 19.)

### IV. T-Shirt Incident

Mr. Teachey only received one writeup, which is called "Record of Discussion" ("ROD") at Equinox, during his employment, and that ROD was only for not wearing his Equinox t-shirt on one occasion. (Teachey Decl. ¶ 54.) On Saturday, January 20, 2018, when Mr. Teachey came back from break, Mr. Shkreli, who was working with him that day, had to leave abruptly due to an emergency. (*Id.* ¶ 55.) Mr. Shkreli did not give Mr. Teachey a chance to go change into his Equinox shirt, which he had left in the locker room. (*Id.* ¶ 56.) As such, during the last hour of his shift, Mr. Teachey was wearing the same shirt he had had on during his break. (*Id.* ¶ 57.) This instance was the only one where Mr. Teachey was not wearing an Equinox shirt. (*Id.* ¶ 58.)

On January 24, 2018, Mr. Serrette called Mr. Teachey into his office. (*Id.* ¶ 59). Apparently, Mr. Serrette had been reviewing security footage of January 20, 2018, and had seen Mr. Teachey not wearing the Equinox shirt. (*Id.* ¶ 60.) Mr. Teachey explained what had happened to Mr. Serrette—that Mr. Shkreli had left abruptly because of an emergency and Mr. Teachey had not had sufficient time to change, as there would not be anyone at the front desk had he taken the time to get changed. (*Id.* ¶ 61.) Mr. Serrette issued Mr. Teachey a ROD for violating Equinox's dress code anyway. (*Id.* ¶ 62.) At Equinox, a ROD may be a "Verbal ROD," "Written ROD," or "Final ROD" depending on the severity of the violation. (*Id.* ¶ 68; Rivera Decl. ¶ 13, Ex. 10, Discipline Policy). Despite the fact that this incident was Mr. Teachey's first ROD and first time he was ever accused of violating the dress code, Mr. Serrette issued him a Final ROD. (*Id.* ¶ 64.)

Mr. Serrette did not have to issue Mr. Teachey any ROD, and he still could have chosen to issue him a lesser one, like a Verbal ROD or Written ROD.  (*Id.* ¶ 65.) There is no rule that one violation of Equinox's dress code results in in a final ROD.  (*Id.* ¶ 66.) Dress code violations are regular; a front desk associate forgetting their front desk greet shirt happens.  (Gecht Tr. 106:12-107:21.) Much younger employees regularly violate Equinox's dress code and "guest pass policy." (Shkreli Decl. ¶ 30.)  None of these younger employees, however, were ever terminated for violating the dress code or "guest policy."  (*Id.* ¶ 31.) Mr. Gecht has never terminated anyone for not wearing their greet shirt.  (Gecht Tr. 111:18-111:22.) In fact, no employee has been fired from the East 61st Street Location for any violation of the grooming policy.  (Def.'s Response to Interrogatory 17.)

### V.  Guest Pass Incident

On Tuesday, January 30, 2018, a member, Terrence Oben, and his guest visited the East 61st Street Location (the "Guest Pass Incident").  (Teachey Decl. ¶ 66.) One of the Front Desk Associates greeted Mr. Oben.  (Oben Tr. 53:7-15.) Mr. Teachey was not at the front desk at the time Mr. Oben or guest arrived.  (Teachey Decl. ¶ 67.)  During this time, Mr. Teachey was back and forth between classes on the third and fifth floors.  (*Id.* ¶ 68).  One of his coworkers, Ms. Arias or James Campbell, a Front Desk Associate who was in his 30s, were at the front desk at the time that Mr. Oben arrived. (*Id.* ¶ 69; Rivera Decl. ¶ 11, Ex. 8.) The Front Desk Associate who was at the front desk when Mr. Oben arrived at the gym as about 5 feet and 9 inches tall, of slim to medium build, with short brown hair, and in his mid 30s.  (Oben Tr. 19:18-21.)  This description fits Mr. Campbell, who is 5 feet 9 inches tall with brownish hair and a toned/fit athletic build, and is in his 30s; Mr. Teachey is also 5 feet 9 inches tall, but with black and gray hair and in his 50s. (Teachey Decl. ¶ 70-71.)

8

Mr. Oben met with Mr. Eckert to discuss a membership after Mr. Campbell greeted him. (Oben Tr. 21:9-24:15.)  After they finished meeting with Mr. Eckert, they went to a couch outside of Mr. Eckert's office to discuss whether to purchase a membership.  When Mr. Teachey returned to the front desk, he saw Mr. Oben and his guest sitting together on the bench. (Teachey Decl. ¶ 72.)  Neither Ms. Arias or Mr. Campbell, who were at the front desk area at the time, seemed concerned by Mr. Oben or his guest.  (*Id.*  ¶ 75; Oben Tr. 25:15-18.)  Ms. Oben approached Mr. Teachey to inquire about whether he had any remaining guest passes. (Teachey Decl. ¶ 76.) Mr. Teachey gave Mr. Oben the requested information, that he did have guest passes, he and his guest went upstairs.  (*Id.* ¶ 77.) Mr. Teachey never told Mr. Oben, "I got you."  (*Id.* ¶ 78.)  Mr. Teachey only answered Mr. Oben's question about the guest passes.  (*Id.* ¶ 78.)  Mr. Teachey believed that Mr. Oben had already been checked in when he saw him by the front desk.  (*Id.* ¶ 79).  No guest or member would be allowed to just walk in, or could get to the area from where Mr. Oben approached Mr. Teachey, without an Equinox employee having checked them in.  (*Id.* ¶ 80.) "Prime-time" hours at Equinox are from 5:00 p.m. to 8:00 p.m., during which time all three managers, Mr. Gecht, Mr. Mongiovi and Mr. Serrette, made a point to stand near the front desk observing the Front Desk Associates while the Front Desk Associates performed their duties.  (*Id.* ¶ 81.)  It would be unlikely that anyone would be able to enter the club without checking in during prime-time hours due to the amount of attention Equinox gives the front desk.  (*Id.* ¶ 81.) It is a team effort.  (*Id.* ¶ 81.)  No one at Equinox ever instructed Mr. Teachey to ask members or guests already in the club whether they had checked in or signed waivers.  (*Id.* ¶ 82.)  That is, Equinox does not have its Front Desk Associates scan the gym to randomly ask members these questions once they are already inside the gym.  (*Id.* ¶ 83.)

Approximately 15 to 20 minutes later, Mr. Eckert approached Mr. Teachey to ask whether he had seen Mr. Oben and his guest standing by the concierge desk. (*Id.* ¶ 83.)  Mr. Teachey told him they had gone upstairs. (*Id.* ¶ 83.)  He rolled his eyes and said that they were supposed to see him first, and went upstairs to find them.  (*Id.* ¶ 83.) About 10 minutes later, Mr. Eckert returned looking very irritated. (*Id.* ¶ 84.) About 5 minutes later, Mr. Teachey saw Mr. Eckert speaking to Ms. Warren in her office. (*Id.* ¶ 85.)  Mr. Eckert called Mr. Teachey in and asked if he had checked in Mr. Oben and his guest.  (*Id.* ¶ 86.)  Mr. Teachey told him that he had not. (*Id.* ¶ 87.)  Mr. Teachey said that he had seen them sitting on the bench while Mr. Teachey was entering the front desk area, and Mr. Oben approached Mr. Teachey to ask whether he had any guest passes.  (*Id.* ¶ 88.)  Mr. Teachey suggested he should ask his coworkers, Ms. Arias or Mr. Campbell whether they had checked in Mr. Oben or had seen him enter.  (*Id.* ¶ 89.)

At this point, Mr. Eckert told Mr. Teachey that Mr. Oben's guest was a guest pass abuser but blew it off, like it meant nothing to him, and told Mr. Teachey to just think nothing of it because it was "no big deal."  (*Id.* ¶ 90.)  Mr. Eckert repeated that Mr. Oben and his guest were supposed to see him first.  (*Id.* ¶ 91.)  Mr. Teachey then left the office.  (*Id.* ¶ 92.)

Apparently, later the night, at 8:41 p.m., Mr. Eckert emailed Mr. Oben that they had "walked straight through, by passing the front desk without checking in as a member or a guest" and that Mr. Oben's guest would "need to purchase a membership to experience the club again." (Rivera Decl. ¶ 15, Ex. 12, Emails.)  At around 11:08 p.m., Mr. Oben's guest responded that she and Mr. Oben were "physically confronted by Kyle and another man, told we weren't allowed to be up there without a guest pass and essentially accused of sneaking in and 'disappearing.'"  (Ex. 12.)  Mr. Eckert humiliated Mr. Oben by essentially calling Mr. Oben and his guest liars; Mr. Oben felt condescended and blamed Mr. Eckert, and only Mr. Eckert, for his mistreatment.  (Oben Tr.

30:20-43:18.)  Mr. Oben's guest tweeted and emailed Equinox complaining about how they were treated.  (Ex. 12.)

## VI. Termination

During the week after the Guest Pass Incident, Mr. Teachey discussed Mr. Oben and the incident with Ms. Arias and Mr. Campbell.  (Teachey Decl. ¶ 93.)  Mr. Teachey asked them if they had checked in Mr. Oben. (*Id.* ¶ 94.)  They told Mr. Teachey that they did not remember if they had but did not deny the possibility that they could have checked in Mr. Oben on the date of the Guest Pass Incident.  (*Id.* ¶ 95.)

Regardless, of the fact that it was clearly Mr. Eckert's customer service that caused the problem, Mr. Eckert blamed Mr. Teachey.  Mr. Eckert text messaged Mr. Serrette, in sum and substance, that Mr. Oben's guest had tweeted about the offensive experience.  He told Mr. Serrette that Mr. Teachey "needs to be fucking fired." (Rivera Decl. ¶ 14, Ex. 11, Text Messages.)  Without any questions, let alone a formal investigation, Mr. Serrette responded, "This would be it," and, "I have him on final."  (Ex. 11.)

In and around the end of January 2018, about three weeks before Mr. Teachey's termination, Mr. Shkreli told Mr. Teachey that Mr. Mongiovi and Mr. Eckert both told him Mr. Teachey was soon going to be terminated, because Mr. Teachey was too old and did not fit in. (Teachey Decl. ¶ 96.)  Mr. Shkreli added that both Mr. Mongiovi and Mr. Eckert made several remarks after the after the Guest Pass Incident about how old Mr. Teachey was and did not belong at the front desk.  (*Id.* ¶ 97.) Mr. Shkreli told Mr. Teachey that Mr. Eckert had said, "Gregory needs to be fired; he's ancient and doesn't belong at the front desk." (*Id.* ¶ 98.)

On February 6, 2018, Mr. Teachey received a text from Mr. Shkreli.  (*Id.* ¶ 99.)  Mr. Shkreli told him that "something was fishy" at Equinox.  (*Id.* ¶ 100.)  Mr. Teachey called Mr. Shkreli, who

told him that Mr. Serrette had asked Ms. Arias to work Mr. Teachey's shift that day and his shift on Saturday.  (*Id.* ¶ 101.)  Mr. Teachey then called Mr. Mongiovi to ask if something was wrong and if he should come in.  (*Id.* ¶ 102.)  Mr. Mongiovi responded that he did not know anything but instructed Mr. Teachey to come to the gym.  (*Id.* ¶ 103.)  Mr. Teachey did so and arrived at the East 61st Street Location that afternoon.  (*Id.* ¶ 1074.)

When Mr. Teachey arrived at Mr. Gecht's office, Mr. Gecht, Mr. Serrette, and Mr. Mongiovi were waiting for him.  (*Id.* ¶ 105.)  Mr. Serrette recited the Equinox Front Desk Associate job description and told Mr. Teachey that Equinox "did not feel [he] was meeting the required expectations."  (*Id.* ¶ 106.)  Mr. Serrette referenced a write-up Mr. Teachey had received on January 24, 2018, for not immediately changing into his Equinox t-shirt after returning from his break. (*Id.* ¶ 107).  Shocked that Mr. Teachey was being fired for not changing into the Equinox t-shirt, Mr. Teachey asked for clarification.  (*Id.* ¶ 108.)  Mr. Serrette simply said, "We have decided to part ways with you."  (*Id.* ¶ 109.)  At this point, Mr. Gecht interjected and brought up the Guest Pass Incident.  (*Id.* ¶ 110.) Mr. Gecht blamed Mr. Teachey entirely for not having Mr. Oben checked in.  (*Id.* ¶ 111.)  Mr. Gecht showed everyone in the office a video on his phone in which Mr. Teachey was seen looking up information for the member on an Equinox iPad.  (*Id.* Decl. ¶ 112.)  Mr. Teachey was looking up Mr. Oben's guest pass information on the iPad.  (*Id.* ¶ 113).  The video also clearly showed that both Mr. Oben and his guest came from the direction of the concierge desk, by the managers' offices, and not from the club entrance opposite the front desk.  (*Id.* ¶ 114.)  Mr. Teachey explained to Mr. Gecht that, while he did not check in Mr. Oben, based on the available information, Mr. Oben should have already been checked in, as he was already inside of the club.  (*Id.* ¶ 115.)  Mr. Teachey again confirmed that, while he had looked up information, he had not checked the member in, and suggested that Mr. Gecht review another

video to find out who was at the front desk at the time that the member and his guest arrived.  (*Id.* ¶ 116.)  Mr. Gecht refused, saying, "It's not important," as he already informed Lori Gerber, General Manager of the East 63rd Street Location, that Mr. Teachey was being terminated.  (*Id.* ¶ 117.)  Mr. Serrette, Mr. Gecht and Mr. Mongiovi terminated Mr. Teachey.  (Serrette Tr. 228:21-22.)

Equinox did not give Mr. Teachey any warning that he would be terminated.  (Teachey Decl. ¶ 120.)  Equinox did not give Mr. Teachey a second ROD; he was simply fired.  (*Id.* ¶ 121.)  Not once did Mr. Mongiovi, Mr. Serrett, or Mr. Gecht tell Mr. Teachey that he was not professional, friendly, and/or courteous, or otherwise not performing his job satisfactorily.  (*Id.* ¶ 122.)  In fact, in every performance review that Mr. Teachey had received at Equinox, he met expectations.  (*Id.* ¶ 126; Rivera Decl. ¶ 12; Ex. 9, Reviews). This instance was the first time that Mr. Teachey allegedly did not follow Equinox's check-in procedure for guests.  (*Id.* ¶ 124.)

In fact, there may not even be a policy regarding admission of guests or non-members and, if there is, it is not written or followed all the time.  (Gecht Tr. 112:3-112:13; Mongiovi Tr. 43:14-44:25.)  Much younger employees regularly violate Equinox's "guest pass policy."  (Shkreli Decl. ¶ 30.)  Mr. Shkreli violated the guest policy.  (Serrette Tr. 77:9-78:9; Rivera Decl. ¶ 11, Ex. 8.) Mr. Shkreli was not fired for it. (Shkreli Decl. ¶ 2.)  Equinox did not even document Mr. Shkreli's violation of the guest policy; Mr. Shkreli he was not even issued a Verbal ROD for his violation. (Serrette Tr 82:2-83:8.)  Mr. Mongiovi has never fired anyone other than Mr. Teachey for violating the guest policy.  (Mongiovi Tr. 45:2-8.)  Before Mr. Teachey, no one had ever been fired for violating the guest policy.  (Serrette Tr. 90:7-91:2.)  Yet, Equinox disingenuously alleges that Mr. Teachey was terminated for violating the t-shirt and guest pass policies.  (Rivera Decl. ¶ 16, Ex.13, Termination Notice.)

### VII.        Post-termination

In and around March 2018, after Mr. Teachey's termination, Mr. Teachey attended a party with several of his former coworkers.  (Teachey Decl. ¶ 127.) At that party, Jemima Crockford, a Personal Trainer, told Mr. Teachey that when he worked with Equinox Mr. Mongiovi said to her, "Not only is Greg in his 50s, but he's too old to be working at the front desk."  (*Id.* ¶ 128.) Ms. Crockford also informed Mr. Teachey that Equinox replaced him as Front Desk Associate with a younger male in his 20s.  (*Id.* ¶ 129.)

### **STANDARD**

Summary judgment is inappropriate unless Defendant can show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  As the moving party, Defendant bears the burden of demonstrating "that no genuine issue respecting any material fact exists." *Gallo v. Prudential Residential Servs.*, LP, 22 F.3d 1219, 1223 (2d Cir. 1994).

The Second Circuit has "repeatedly emphasized the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent." *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010) (quotation omitted).  Indeed, "direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006).

**ARGUMENT**

**POINT I.**
**Defendant Concedes that Plaintiff Successfully**
**Established a *Prima Facie* Case**

Courts in this circuit analyze ADEA wrongful termination claims under the McDonnell Douglas burden-shifting framework. *See Gorzynski*, 596 F.3d at 106. Under this framework, the plaintiff must establish a *prima facie* case of intentional discrimination. *Id*. at 105. If he does so, the burden shifts to the employer to articulate some legitimate, non-discriminatory reason for the claimed adverse employment action. *Id.* If it articulates such a reason, the plaintiff may still prevail if he can proffer evidence from which a reasonable jury could conclude that his age was a but-for cause of the adverse employment action. *Id.* at 105-07.

Pretext may be demonstrated either by reliance on the evidence comprising the *prima facie* case or by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons. *Polito v. TriWire Eng'g Solution, Inc.*, 699 F. Supp. 2d 480, 492 (E.D.N.Y. 2010)).

Defendant all but concedes that Mr. Teachey has stated a *prima facie* case. Instead of debating whether Plaintiff has established a *prima facie* case, Defendant starts its argument on the last step: whether Plaintiff has presented evidence that a reasonable juror could find that Equinox terminated Teachey because of his age. As shown below, Mr. Teachey has met his burden.

15

## POINT II.
### A Reasonable Juror Could Find that Equinox's Purported Reasons
### for Terminating Mr. Teachey are Pretext for Age Discrimination.

An inference that a discharge was related to age discrimination is sufficient to deny a motion for summary judgment. *Cf. Bailey v. Frederick Goldman, Inc.*, No. 02 Civ. 2429 (TPG), at *10 (S.D.N.Y. Mar. 22, 2006) (granting summary judgment where no inference that a discharge was related to age). There is an abundance of evidence—anyone of which is sufficient—from which a reasonable juror could conclude that Equinox's purported reasons for terminating Teachey are pretext for age discrimination.

### A. *No other employee had ever been disciplined under the dress code policy.*

Equinox treated its younger employees better than Teachey, excluding them from the consequences of rule breaking. Treating employees outside of a plaintiff's protected class evidences pretext. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 804, 93 S. Ct. 1817, 1825, 36 L. Ed. 2d 668 (1973). Disparate implementation of workplace rules can support an inference of discrimination. *Walker v. N.Y.C. Dep't of Corr.*, 01 Civ. 1116 (LMM), 2008 U.S. Dist. LEXIS 97109, at *76–77 (S.D.N.Y. Nov. 18, 2008).

Here, no other employee had been disciplined let alone terminated for violating the dres code. Despite this, Equinox immediately issued Teachey a Final ROD even though it was his first offense. Mr. Serrette would have been well within their discretion to issue him the less severe Verbal or Written ROD (or not give him a ROD at all). The fact that Equinox selectively applied the guest policy specifically against Mr. Teachey demonstrate that Equinox did not discipline Plaintiff for the violation but because of his age. The record establishes that Equinox did not discipline younger employees who had violated the very same policy for which Mr. Teachey received severe punishment. Equinox skipped verbal and written warnings and went directly to a

final ROD even though it was Mr. Teachey's first and only violation.  Additionally, the severity of the punishment applied to Mr. Teachey for this single, first-time offense demonstrate that Equinox treated Mr. Teachey unequally because of his age.  From these facts, a reasonable juror could find that the purported reasons for Equinox's decision to terminate Mr. Teachey for violating the dress code policy are mere pretext.

### B. Teachey did not violate the so-called guest policy and Equinox knew it.

#### 1. Equinox does not have a guest policy.

Evidence of procedural irregularities demonstrate pretext.  *Tolbert v. Smith*, 790 F3d 427, 438 (2d Cir 2015); *see Zahorik v. Cornell Univ.*, 729 F2d 85, 93 (2d Cir 1984) ("Departures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the decision.").

Here, there is conflicting evidence regarding Equinox's guest policy.  Indeed, Mr. Gecht testified that he did not know if there was a policy and could not recall seeing anything regarding a guest policy in writing.  (Gecht Tr. 112:3-112:13.)  Also, Mr. Mongiovi was not certain if the guest policy was followed all of the time. (Mongiovi Tr. 44:22-25.)  Mr. Shkreli stated that the only policy regarding guests was to prohibit non-members from using the facilities; however, this policy never enforced, and many non-members were allowed in on the condition that they were acquainted with management or if management favored the employees inviting the non-members. (Shkreli Decl. ¶¶ 28-29.) A reasonable juror could determine that there was no guest policy that Mr. Teachey could have violated.

#### 2. Even if Equinox had a guest policy, Teachey did not violate it.

Mr. Teachey was not involved in whether Mr. Oben and his guest had checked in and had every reason to believe that they had already been checked in.  Mr. Teachey was not present at the

front desk when Mr. Oben arrived.  By all accounts, it appears that it was Mr. Campbell who failed to check in Mr. Oben.  Mr. Campbell greeted and directed Mr. Oben to Mr. Eckert's office.  Neither Mr. Campbell nor Mr. Eckert checked Mr. Oben in.  After the meeting, Mr. Oben asked Mr. Teachey whether he had any guest passes, and Mr. Teachey answered the question.  Given that Mr. Oben was in an area of the club that would have required him to be checked in, Mr. Teachey had every reason to believe that he already was in checked in and there was no reason to check him in again.

Further, the front desk operates as a team, with each Front Desk Associate, Assistant General Manager and General Manager ensuring that it run orderly, especially during prime time hours.  Mr. Campbell and Mr. Eckert could have checked in Mr. Oben and had his guest complete a waiver; Mr. Campbell and Mr. Eckert could have communicated to Mr. Teachey that Mr. Oben and his guest had arrived.  None of these employees, however, had done so.  It is disingenuous to put all of the blame on Mr. Teachey when each part of the team had failed.

3. *Even if Mr. Teachey did violate the  guest policy, doing so is not an offense calling for termination.*

Finally, any claim that Equinox makes to the purported seriousness of the rule breaking is undercut by the fact that Mr. Shkreli, and Equinox's younger employees, violated the guest policy without receiving any discipline. A court can infer a discriminatory motive where an employer disciplines one employee within a protected class but does not discipline another outside of it for the same offense. *Feingold v. State of New York,* 366 F.3d 138, 153–54 (2d Cir. 2004)

Mr. Shkreli violated the guest policy.  (Serrette Tr. 77:9-78:9.)  Equinox did not fire him for it. (Shkreli Decl. ¶ 2.)  Equinox did not event document when he violated the guest policy. (Serrette Tr 82:2-83:8.)  Younger employees regularly violated Equinox's guest pass policy and none of these younger employees were terminated either.  (Shkreli Decl. ¶¶ 30-31.) Indeed, Mr.

Mongiovi had never fired anyone for violating the guest policy, except Mr. Teachey.  (Mongiovi Tr. 45:2-8.)  No one had ever been fired for violating the guest policy before Teachey.  (Serrette Tr. 90:7-91:2.)

> 4. *Kyle Eckert, the employee most responsible for the Guest Pass Incident, was not disciplined.*

Mr. Eckert was the employee towards whom Mr. Oben and his guest directed their dissatisfaction with Equinox's customer service.  Yes, Equinox did not discipline Mr. Eckert.  If Mr. Teachey's age had nothing to do with Equinox's determination, it defies common sense that Equinox would terminate Mr. Teachey, who had relatively little involvement in the Guest Pass Incident, but would not even discipline Mr. Eckert, who caused the problem by being inappropriate.

### C. The fact that there is a dearth of Front Desk Associates in Teachey's age group at the East 61st Street and East 63rd Street Locations supports pretext.

A dearth of members in a protected class supports pretext. *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 77 (2d Cir. 2016).  The average age of Equinox's Front Desk Associates at its East 61st Street and East 63rd Street Locations was 27 years old.  (Rivera Decl. ¶¶ 9-10 , Ex. 7.) Of the 110 Front Desk Associates, 83 were in their 20s, 24 in their 30s, 2 in their 40s, and 1 (Mr. Teachey) in his 50s.  (*Id.* ¶¶ 9-10, Ex. 7.) This dearth of employees in Mr. Teachey's protected class supports an inference of discrimination.

**POINT III.**

**There Is Ample Evidence From Which a Reasonable Juror Could
Draw the Inference that Equinox Would Not Have Terminated Mr.
Teachey Had He Been Younger.**

**A. *Equinox's management, including those who participated in the decision to terminate
his employment, made ageist comments about Teachey.***

Statements made by Equinox's management—Mr. Mongiovi, Mr. Hooks, Mr. Rivera, and

Mr. Gecht—fall under Rule 801(d)(2)(D) of the Federal Rules of Evidence. These individuals

supervised Mr. Teachey and held management positions, and the at-issue statements concern Mr.

Teachey's employment. *Cf. Smith v. New York & Presbyterian Hosp.*, No. 18 CIV. 776 (PAE),

2020 WL 777786, at *20 (S.D.N.Y. Feb. 18, 2020) (not imputing co-worker's statement to

employer since not a supervisor). As such, these statements are not hearsay; they are admissions

of a party opponent.

Mr. Teachey witnessed the following discriminatory statements being made: Mr. Mongiovi

commented, "Oh, that's your birthday. I see you're 50." (Teachey Decl. ¶ 26.) Mr. Eckert said to

Mr. Mongiovi, "He's an old queen." (*Id.* ¶ 27). Mr. Mongiovi told Mr. Teachey that Mr. Hooks

had asked him, after they had hired Mr. Teachey, why Mr. Mongiovi had hired somebody so old

as a Front Desk Associate, and that Mr. Teachey was too old to be at the front desk. (*Id.* ¶ 28.)

Mr. Rivera told Mr. Teachey that Equinox had only hired Mr. Teachey because, at the time of his

application, Equinox was desperate for front desk associates and, absent these circumstances,

Equinox would never have hired him because of his age. (*Id.* ¶¶ 29-33.) Mr. Mongiovi frequently

told Mr. Teachey that Mr. Teachey was too old to be working at the front desk, and made snide

comments like, "What do you want to do when you grow up?" (*Id.* ¶ 35.) Mr. Gecht screamed

at Mr. Teachey, saying, "You're too fucking old. Aren't you like 50? You shouldn't be fucking up

like this at the front desk. What is your fucking problem?" when he was angry with Mr. Teachey. (*Id.* ¶ 39.)

Further, Mr. Shkreli has personal knowledge that Mr. Mongiovi told Equinox employees Mr. Teachey's exact age and called Mr. Teachey "ancient." (Shkreli Decl. ¶ 20.) And, Mr. Eckert, and Mr. Mongiovi would laugh at Mr. Teachey after exchanging offensive comments about his age. (*Id.* ¶ 22.) These statements are not hearsay.

These statements are not "stray remarks," either. "'Verbal comments constitute evidence of discriminatory motivation when a plaintiff demonstrates that a nexus exists between the allegedly discriminatory statements and a defendant's decision to discharge the plaintiff.'" *Silver v. N. Shore Univ. Hops.,* 490 F.Supp.2d 354, 362 (S.D.N.Y. 2007). Courts have found the following factors relevant to such a determination: "(1) who made the remark, *i.e.,* a decisionmaker, a supervisor, or a low-level co-worker; (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark, *i.e.,* whether a reasonable juror could view the remark as discriminatory; and (4) the context in which the remark was made, *i.e.,* whether it was related to the decision making process." *Silver,* 490 F.Supp.2d at 363 (citations omitted).

Even a "stray" remark, however, can provide a window into what is motivating the speaker and thus create an issue of fact for a jury. *Cadet-Legros v. New York Univ. Hosp. Ctr.*, 135 A.D.3d 196, 205 n. 6 (N.Y. App. Div. 2015). The Second Circuit has counseled against reflexively ignoring comments labeled as "stray." *See Tomassi v. Insignia Fin. Group, Inc.*, 478 F.3d 111, 115-16 (2d Cir. 2007) ("Where we described remarks as 'stray,' the purpose of doing so was to recognize that all comments pertaining to a protected class are not equally probative of discrimination and to explain in generalized terms why the evidence in the particular case was not

sufficient. We did not mean to suggest that remarks should first be categorized either as stray or not stray and then disregarded if they fall into the stray category.").

The above statement statements were all made by Equinox's management, many of whom participated in Mr. Teachey's termination. These statements were also made about Mr. Teachey's employment, specifically, about termination, and the statements—specifically, those made by Mr. Rivera and Mongiovi, in which they explicitly say that Mr. Teachey was too old to be a Front Desk Associate—evidence that Equinox terminated Mr. Teachey because of his age. A reasonable juror could reasonably infer from these statements that Equinox terminated Mr. Teachey because of his age.

**B.  *Equinox's management replaced Teachey with a younger individual, consistent with Equinox's preference for Front Desk Associates younger than Teachey.***

An employer's replacement of an employee with someone outside of the plaintiff's protected class raises an inference of discrimination. *Tarshis v. Riese Organization,* 211 F.3d 30, 36 (2d Cir.2000). Here, Equinox replaced Mr. Teachey with a Front Desk Associate in his 20s and did not hire any Front Desk Associates of Mr. Teachey's protected class after Mr. Teachey's termination.

**C.  *Equinox's management discriminated against other employees based on protected characteristics.***

Evidence of discrimination against one group of people can support an inference of discrimination against another group. *Hollander v. American Cyanamid Company*, 172 F.3d 192, 204 (2d Cir. 1999) (concurring); *Fuentes v. Perskie*, 32 F.3d 759, 2014 (3d Cir. 1994 (part of plaintiff's burden of proof can be met by showing discrimination against other protected classes of persons); *see Schwapp v. Town of Avon*, 118 F.3d 106 (2d Cir. 1997) (in a racial harassment

suit brought by an African American, evidence of derogatory comments about Hispanics, Middle Easterners or other minority groups was also pertinent).

Here, Mr. Serrette shared inappropriate sexual comments about his sex life, such as, "You saw that guy that just came in? I had sex with him." (Shkreli Decl. ¶ 9-13.) After interviewing clients, Mr. Mongiovi would tell Mr. Shkreli, "I want to fuck the shit out of him," referring to the male interviewee and touched Mr. Shkreli inappropriately. (*Id.* ¶ 14-19.) Based upon the fact that Equinox's management refused to protect Mr. Shkreli from sexual harassment, a reasonable juror could draw the inference that Equinox would also disregard anti-discrimination laws protecting Mr. Teachey. That is, Equinox's discrimination against other employees makes it more likely that it would discriminate against Mr. Teachey.

### D. The "same actor" inference does not support the dismissal of this case.

Equinox's reliance on the "same actor" inference—that it is difficult to infer that the person who hires an employee in a protected class would "suddenly develop an aversion to members of that class," *Ruane v. Continental Cas. Co.,* No. 96 Civ. 7153, 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998)—is misguided.

> 1. *The "same actor" inference does not apply to this case, as Mr. Mongiovi was the only person to participate in the both decisions.*

In order for the presumption against discriminatory intent to arise under the same actor doctrine, the defendant must establish the identity of the person or persons who made the decision to hire and then later to discharge the plaintiff. *Jackson v. Post Univ., Inc.*, 836 F. Supp. 2d 65, 90 (D. Conn. 2011). The involvement of multiple decision makers cuts against the inference unless one management-level employee played a substantial role in both the hiring and firing of the plaintiff.'") (quoting *Ramos v. Marriott Int'l,* 134 F.Supp.2d 328, 346 (S.D.N.Y.2001)); *accord Thomas v. iStar Financial, Inc.,*438 F.Supp.2d 348, 361–62 (S.D.N.Y.2006).

First, the "same actor" inference should not apply here because Mr. Mongiovi was not the sole person responsible for hiring and firing Teachey.  Mr. Teachey was hired by Ms. Thompson; Ms. Bonilla, an unknown individual working as a Front Desk Manager on Duty, Mr. Hook, Mr. Mongiovi and Mr. Rivera.  Mr. Teachey was fired by Mr. Mongiovi, Mr. Gecht and Mr. Serrete. Notably, Mr. Mongiovi was one of the *least* senior individuals involved in the decision to hire him. Mr. Hook was the General Manager—the most senior.  Mr. Mongiovi was just one of three assistant managers involved.  Any inference that be drawn against discrimination is extremely diluted, given the fact that Mr. Mongiovi was one of many individuals who participated in the decision.  The same is true about the decision to terminate him.  Mr. Gecht was the General Manager; Mr. Mongiovi was just one of two assistant managers.

Second, Mr. Echert also participated in the termination.  Indeed, Mr. Echert was the originator of the idea; he immediately voiced his desire to fire Mr. Teachey, and Mr. Serretta immediately agreed, without any further consideration.

As Teachey was not hired and fired by the same individual, the "same actor" inference should not apply here.  No inference against discrimination should be drawn based simply on the fact that Mr. Mongiovi participated in hiring and firing Mr. Teachey.

> 2. *Even if the "same actor" inference" were applicable, Mr. Rivera's statement—*
> *that Equinox was momentarily short staffed or otherwise would not have hired*
> *him—rebuts it.*

Even if the "same actor" inference did apply, it does not preclude an inference of discriminatory intent.  *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305-06 (S.D.N.Y. 1999).  It is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that the "same actor" inference cannot become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand. *See, e.g., Grady v. Affiliated Cent., Inc.,* 130 F.3d

553, 560 (2d Cir. 1997); *Ruane*, 1998 WL 292103, at *8.   There are a variety of plausible explanations of such "hire-fire" conduct that may support an inference of discriminatory animus, and courts should not underestimate "the variety of unlawful motivations which may lurk behind the conduct of a person who hires and then fires an individual in a protected class." *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305-06 (S.D.N.Y. 1999).   Such motivations, like all issues of intent, are by their very nature difficult to bring to light, especially prior to scrutiny of the relevant individual on the stand at trial. *Id.*

Here, Mr. Rivera's statement explains exactly why Equinox would have hired Teachey, despite having an animus against people in his protected class.   Equinox needed to fill the Front Desk Associate position immediately and Mr. Teachey was available.   Had Equinox not been desperate to fill the position—as Mr. Rivera explained—they would not have hired Mr. Teachey. This testimony annihilates any inference against discrimination that could be drawn from Mr. Mongiovi's participation in both Mr. Teachey's hiring and firing.

### POINT IV.
### Plaintiff's NYCHRL Claim Must Not Be Dismissed for the Same Reasons as His ADEA Claim.

Courts *do not* analyze discrimination claims under the NYCHRL according to the *McDonnell-Douglas* burden-shifting framework.   A defendant violates the NYCHRL where it either (1) terminates a person because of his or her protected characteristic, or (2) discriminates against such a person in compensation or in terms, conditions, or privileges of employment. *Mihalik*, 715 F.3d at 110 n.8 ("the NYCHRL simplified the discrimination inquiry: the plaintiff need only show that her employer treated her less well, at least in part for a discriminatory reason.").   As shown above, Equinox treated Mr. Teachey less well because of his age.   As such, a reasonable jury could find that Equinox's mistreatment of Teachey was motivated by his age.

## **CONCLUSION**

For the foregoing reasons, Defendant's motion for summary judgment must be denied.

Dated: New York, New York
July 20, 2020

Respectfully submitted,

By:    <u>s/Edgar M. Rivera</u>
Edgar M. Rivera
THE LIDDLE LAW FIRM PLLC
1177 Avenue of the Americas, 5th Floor
New York, NY  10036
Office Tel: 646-452-7211
Mobile Tel: 646-400-2249
erivera@liddlelaw.com

*Attorneys for Plaintiff*