UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X
                                                                        :
GREGORY TEACHEY,                                                        :
                                                                        :
                              Plaintiff,                                :
                                                                        :
              -v-                                                       :
                                                                        :
EQUINOX HOLDINGS INC.,                                                  :
                                                                        :
                              Defendant.                                :
                                                                        :
------------------------------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _04/14/2022_

18-cv-10740 (LJL)

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff Gregory Teachey ("Teachey" or "Plaintiff") brings claims against his former employer Equinox Holdings Inc. ("Equinox" or "Defendant"), alleging that Defendant discriminated against him based on his age in violation with the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code §§ 8-101 *et seq.*, by terminating his employment. Dkt. No. 1. Defendant moves pursuant to Federal Rule of Civil Procedure 56 for summary judgment dismissing Plaintiff's complaint in its entirety. Dkt. No. 61.

For the following reasons, the motion for summary judgment is denied.

## BACKGROUND

The following facts are undisputed for purposes of this motion except where otherwise indicated and are construed in favor of the nonmoving party.[1]

---

[1] These facts are drawn from the summary judgment record before the Court. However, in deciding this motion for summary judgment, the Court does not consider the declaration of Michael Shkreli, one of Plaintiff's former co-workers (the "Shkreli Declaration"). *See* Dkt. No. 74-2 ("Shkreli Decl.") ¶ 1. The pertinent facts related to this declaration are outlined in the Court's November 6, 2020 Order at Dkt. No. 83; the parties' November 19, 2020 letters at Dkt. Nos. 85–86; the Court's December 17, 2020 Order at Dkt. No. 87; and the parties' letters at Dkt.

## I.      The Parties

Equinox operates fitness facilities and sports clubs at locations across the country,

including multiple locations in New York City.  Dkt. No. 63 ("Equinox's 56.1") ¶ 1; Dkt. No. 75

("Teachey's 56.1 Response") ¶ 1.

_____

Nos. 88–89.  In short, Defendant seeks to exclude the Shkreli Declaration from consideration as part of the summary judgement record because Shkreli has made it clear that he will not testify in a manner consistent with his deposition if called to testify at trial; Shkreli has stated that he does not remember the declaration or the events involving Plaintiff's employment described therein, does not want to participate in the litigation, and, if called, will not be able to testify at trial consistent with his declaration because he does not recall the events.  Dkt. Nos. 85, 87.  Federal Rule of Civil Procedure 56(c)(4) requires that an "affidavit or declaration used to support or oppose a [summary judgment] motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  "Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial."  *Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001).  Moreover, "an implicit or explicit showing that the affiant is prepared to testify in a manner consistent with an affidavit is required to oppose summary judgment."  *Id.* at 684; *see also Noval Williams Films LLC v. Branca*, 2018 WL 389092, at *2–3 (S.D.N.Y. Jan. 11, 2018).  It is undisputed, on the record before the Court, that Shkreli is not prepared to testify at trial in a manner consistent with his affidavit; he has explicitly stated as much to counsel.  Plaintiff's assertion that it "intends to call Mr. Shkreli at trial, whether as a friendly or hostile witness, and will use the Declaration to impeach him if necessary," Dkt. No. 85, is of no avail.  In *Santos*, the Second Circuit considered the admissibility of an affidavit on which the plaintiff "relied exclusively" in opposition to summary judgment; in the affidavit, a witness "recanted statements that incriminated [the plaintiff] and claimed that the police had coerced him into making those statements," but the same witness later gave a second deposition from which it was clear that he "would testify at trial that he was not coerced into incriminating [the plaintiff] and that he fabricated the incriminating story from information obtained through the media," contrary to what he had stated in his affidavit.  243 F.3d at 683–84.  The Second Circuit noted that, because the affiant would not testify at trial consistent with his statements in the affidavit, the affidavit "would be admissible at trial only as a prior inconsistent statement," which would be admissible "for impeachment purposes only" and would be "inadmissible hearsay for substantive purposes," unless the statements were made at "a trial, hearing, or other proceeding, or in a deposition," in accordance with Federal Rule of Evidence 801(d)(1)(A).  *Id.* at 684.  The court further noted that meeting with an attorney and signing an affidavit prepared by that attorney does not constitute an "other proceeding" under Rule 801(d)(1)(A); accordingly, it concluded that the affidavit "could be admitted at trial only for impeachment purposes, and it cannot itself be used to support [the plaintiff]'s case at the summary judgment stage."  *Id.*  Here, too, Shkreli's declaration itself would be inadmissible for substantive purposes, and therefore cannot be used to support Teachey's case at this stage.

Teachey, who was born in 1966, worked for Equinox at its East 61st Street and East 63rd Street locations. Equinox's 56.1 ¶ 2; Teachey's 56.1 Response ¶ 2. At the time of his hire, he was fifty years old. Equinox's 56.1 ¶ 15; Teachey's 56.1 Response ¶ 15. Beyond the fact that Teachey was interviewed in person by several Equinox employees who may or may not have drawn inferences about his age from his appearance, there is no evidence suggesting that Equinox or any of Teachey's supervisors were aware that Teachey was fifty before he began working at Equinox. *See, e.g.*, Dkt. No. 66-1 ("Teachey Dep.") at 55:18–58:24 (testifying that during his interview process, no one asked him how old he was, he did not volunteer that information, and he does not remember anyone seeing his birth date until his onboarding process, after he was hired).

Several supervisors at the East 61st Street location are relevant to this action. First, between October 2016 and May 2018, Leo Mongiovi served as an Assistant General Manager of the East 61st Street location; he was later promoted to General Manager. Equinox's 56.1 ¶ 4; Teachey's 56.1 Response ¶ 4. Second, during the relevant period to this action, Adam Gecht was a Regional Director for Equinox, and for portions of 2017 and 2018, he served as Acting General Manager of the East 61st Street location. Equinox's 56.1 ¶ 3; Teachey's 56.1 Response ¶ 3. Third, Jonathan Rivera was an Assistant General Manager at the East 61st Street location for some of the relevant time period but left before Teachey was terminated. Equinox's 56.1 ¶ 16; Teachey's 56.1 Response ¶ 16; *see also* Teachey Dep. at 123:18–25. Finally, Darnell Serrette served as an Assistant General Manager of the East 61st Street location from November 2017 until March 2019, when he was promoted to General Manager of Equinox's East 74th Street location. Equinox's 56.1 ¶ 5; Teachey's 56.1 Response ¶ 5.

## II.        Teachey's Employment at Equinox and his Termination

Teachey was interviewed and hired for a position at Equinox's front desk in February 2017 and began his employment in late February 2017.[2]  Equinox's 56.1 ¶¶ 13–14; Teachey's 56.1 Response ¶¶ 13–14.  As noted above, Teachey was fifty years old when he was hired. Equinox's 56.1 ¶ 15; Teachey's 56.1 Response ¶ 15.

As Assistant General Manager of the East 61st Street location, Mongiovi interviewed and hired Teachey.  Equinox's 56.1 ¶ 13.  Construing the facts in favor of Teachey, many others were also involved in the interview process and the decision to hire Teachey, including Cathe Thompson, the Group Fitness Manager; Linda Bonilla, the Assistant Spa Manager; an unknown individual working as a Front Desk Manager on duty; Craig Hook, the General Manager; and Jonathan Rivera.  Teachey's 56.1 Response ¶ 13.

In Teachey's job at the East 61st Street location, he was initially supervised by Mongiovi and Rivera; after Rivera left his position, Teachey was supervised by Mongiovi and Serrette. Equinox's 56.1 ¶ 16; Teachey's 56.1 Response ¶ 16.

### A.        Teachey's Job Responsibilities

As a Front Desk Associate, Teachey was responsible for greeting every Equinox member and guest in a professional and enthusiastic manner and scanning and verifying membership IDs. Equinox's 56.1 ¶ 19; Teachey's 56.1 Response ¶ 19.

Equinox maintains grooming standards and a dress code for its employees; the grooming standards, which are available to all employees, require non-managerial staff members to wear

---

[2] The parties dispute the exact day on which Teachey's employment began.  Equinox asserts that Teachey's employment began on February 20, 2017, Equinox's 56.1 ¶ 14; Teachey asserts that his employment began on February 27, 2017, Teachey's 56.1 Response ¶ 14.  Nonetheless, it is undisputed that Teachey began his employment in or around late February 2017, and the exact date is immaterial to this motion.

shirts corresponding to their department and, in the case of front desk staff, an Equinox nametag. Equinox's 56.1 ¶¶ 10–11; Teachey's 56.1 Response ¶¶ 10–11.  In line with that policy, Front Desk Associates must wear appropriate Equinox attire at all times, including a nametag. Equinox's 56.1 ¶ 21; Teachey's 56.1 Response ¶ 21.  Teachey was provided with an Equinox uniform shirt when he began his employment and was further provided with two new uniform shirts in April or May 2017 when Equinox changed its uniforms.  Equinox's 56.1 ¶ 18; Teachey's 56.1 Response ¶ 18.

**B.    The January 20, 2020 Incident**

Two disciplinary incidents are relevant to this motion.  The first disciplinary incident relevant to this action occurred on January 20, 2020; Gecht and Serrette, while reviewing camera footage of the club, saw that Teachey was out of uniform during his shift, without an Equinox nametag, sitting on top of the front desk rather than standing behind it.  Equinox's 56.1 ¶ 24; Teachey's 56.1 Response ¶ 24.  Teachey admits that he was not wearing his Equinox uniform shirt on this occasion.  Equinox's 56.1 ¶ 25; Teachey's 56.1 Response ¶ 25.

After the incident, Serrette drafted a disciplinary write-up, called a "Record of Discussion" ("ROD"), to be issued to Teachey.  Equinox's 56.1 ¶ 26.  Serrette testified that the write-up was drafted "[b]ecause Teachey's conduct violated Equinox's Grooming Standards and dress code."  *Id.*  There were lesser sanctions Serrette could have given; he could have chosen not to issue an ROD at all or to give a verbal or written ROD (rather than a final ROD), which are lesser sanctions.  Teachey's 56.1 Response ¶ 26.  The ROD reminded Teachey that "[f]ollowing Equinox guidelines [was] part of [his] responsibility while employed with the company," and that additional "deviation[s]" from Equinox policies or guidelines could "result in further disciplinary action, up to and including termination of employment."  Equinox's 56.1

¶ 27; Teachey's 56.1 Response ¶ 27.  On or about January 24, 2018, Serrette presented the ROD to Teachey, who declined to sign the document.  Equinox's 56.1 ¶ 28; Teachey's 56.1 ¶ 28.

There is undisputed evidence that dress code violations do occur among other employees. *See* Dkt. No. 74-6 ("Gecht Dep.") at 106:2–107:21 (describing several such incidents and noting that front desk associates forgetting their front desk greet shirt "does happen," but "not frequently").  There also is undisputed evidence that most of the employees who worked on the front desk were in their 20s or 30s.  Dkt. No. 74 ¶¶ 9–10; *id.*, Ex. 7.  It is similarly undisputed that Equinox has never terminated anyone simply for not wearing their Equinox uniform shirt and that Teachey himself was not terminated for the dress code violation alone.  Teachey's 56.1 Response ¶ 26; Dkt. No. 82 ("Equinox's 56.1 Reply") ¶ 26.

Teachey had never been cited for any disciplinary violation prior to the January 20, 2020 incident.  His employment was not terminated on the basis of the January 20, 2020 incident.

### C.    The January 30, 2020 Incident

On January 30, 2020, a second incident involving Teachey occurred.  On that day—on which Teachey was working at the front desk—an Equinox member and his guest entered the gym without being properly checked in.  Front Desk Associates like Teachey were responsible, with respect to guests, for ensuring that all guests complete and sign a legible guest waiver, making a photocopy of the guest's photo ID, and sending guests to the appropriate membership advisor with a completed guest waiver.[3]  Equinox's 56.1 ¶ 20; *see also* Dkt. No. 64 ("Mongiovi Decl."), Ex. E at 2.

---

[3] Teachey claims that there was no such policy; however, there is no genuine dispute of material fact that Equinox's policy did require front desk associates to check-in guests.  *See* Mongiovi Decl. ¶ 18; Dkt. No. 65 ("Serrette Decl.") ¶ 8; Mongiovi Decl., Ex. E at 2.  Teachey denies that such a policy existed; however, the evidence he cites confirms that such a policy existed, although the managers were unsure whether it was a written policy or whether that policy was ever broken.  *See* Dkt. No. 74, Ex. 6 at 112:3–112:13; Dkt. No. 74, Ex. 6 at 42:14–44:25.

Construing the evidence in favor of Teachey, a reasonable jury could find that Teachey was not at the front desk when the member and his guest entered and therefore did not admit the guest without asking for the waiver or properly checking the guest in. Teachey states he was not at the front desk at that point; rather, he was back and forth between classes on the third and fifth floors. Dkt. No. 74-1 ("Teachey Decl.") ¶¶ 67–68. The member, Mr. Oben, testified that when he entered, he and his guest—his then-fiancée—came in, spoke to a Front Desk Associate, and were directed to speak with a Membership Associate, who came to speak with them at the front desk. Dkt. No. 74–4 ("Oben Dep.") at 17:15–21:12; *see also* Equinox's 56.1 ¶ 32. He describes the Front Desk Associate he spoke to when he initially entered the gym with his guest as "about 5 foot 9," "[s]lim to medium build," "[s]hort brown to dark hair," and "[p]robably in his mid-30s." Oben Dep. at 19:6–23. That description matches James Campbell, another Front Desk Associate who was at the front desk when Oben arrived, as "about 5 feet 8 inches with brownish hair," with "a toned/fit athletic build," who "was in his 30s" in 2018. In contrast, Teachey is "5 feet 9 inches with short black and grey hair," with "an athletic build," and was "in [his] 50s" at the relevant time. Teachey Decl. ¶¶ 69–71.

According to Teachey, he did not encounter Oben and his guest until he "saw Mr. Oben and his guest sitting together on the bench by the concierge desk," which "is located by the managers' office," and which, in order to reach, "one must have already entered the building and, therefore, be checked in." *Id.* ¶¶ 72–74. At that point, Teachey's coworkers at the front desk—Campbell and Arias—did not appear to Teachey to be concerned by Oben and his guest. *Id.* ¶ 75. Oben "approached [Teachey] to inquire about whether he had any remaining guest passes"; he told Oben that he did, and Oben and his guest then went upstairs. *Id.* ¶¶ 76–77; *see also* Equinox's 56.1 ¶ 34; Teachey's 56.1 Response ¶ 34. Teachey states that he "believed that

Mr. Oben had already been checked in when [he] saw him by the front desk," because he was not present at the front desk when Oben and his guest arrived, but knew that he and his guest would not have been able to walk in and be in the space by the manager's offices without having already been checked in.  Teachey Decl. ¶¶ 79–80.  Finally, he states that "[n]o one at Equinox ever instructed [him] to ask members or guests already in the club whether they had checked in or signed waivers."  *Id.* ¶ 81.

Oben also testified that after he and his guest were admitted to the club, the two went with the Membership Associate to an office, where they sat down and went through potential membership plans and options for his then-fiancée; when she decided she did not want to sign up on the spot, he suggested that she could use one of his guest passes and work out.  Oben Dep. at 21:24–23:10; *see also* Equinox's 56.1 ¶ 32.  At that point, they got up to go to the gym.  Oben Dep. at 24:17–20; *see also* Equinox's 56.1 ¶ 32.  At some point, Teachey either said to Oben "I got you," according to Oben, Oben Dep. at 2512–26:12, or, according to Teachey, stated that the member had a guest pass available.  Teachey Decl. ¶ 78.  Regardless, it is undisputed that, during this conversation, Teachey did not check in Oben and the guest or check in the system if they had already been checked in.  Equinox's 56.1 ¶ 34; Teachey's 56.1 Response ¶ 34.

After Oben and his guest entered the gym, the membership advisor, Kyle Eckert, approached Teachey and asked him whether he had seen Oben and his guest; Teachey replied that he had and that they had gone upstairs.  Teachey Decl. ¶ 83.  Eckert then informed Serrette that Teachey had allowed an Equinox member and his guest to access the gym without signing a guest waiver or requiring the member to use a guest pass.  Equinox's 56.1 ¶ 30.  After Eckert spoke to Serrette about the matter, Eckert and Serrette approached Oben and his guest and told them that they had not signed in correctly; they asked Oben and his guest to go back to the front

desk to ensure that the guest signed a waiver and that Oben either use one of his available guest passes or pay a day pass fee for his guest.  Equinox's 56.1 ¶ 35; Teachey's 56.1 Response ¶ 35.

After the January 30 incident, Eckert informed Serrette that the guest had publicly complained via Twitter that she had been "humiliated" by the customer service she received at the East 61st Street location.  Equinox's 56.1 ¶ 36; Teachey's 56.1 Response ¶ 36.  Serrette also learned that the guest sent an email complaint to Equinox's social team, which was forwarded to Gecht.  Equinox's 56.1 ¶ 37; Teachey's 56.1 Response ¶ 37.

### D.    Teachey's Termination

After the January 30 incident, Teachey discussed the incident with Eckert and suggested that Eckert ask his on-duty front desk coworkers, who were in the twenties and thirties, whether they had checked in Oben or seen him enter; however, he does not believe that Eckert disciplined those coworkers or investigated whether they were at the front desk when Oben arrived. Teachey Decl. ¶¶ 118–119.

Thereafter, Serrette drafted a second ROD for Teachey and consulted with Gecht and Mongiovi; rather than give Teachey the second ROD, the three decided to terminate Teachey's employment.  Equinox's 56.1 ¶ 38; Teachey's 56.1 Response ¶ 38.  On February 6, 2019, Gecht, Mongiovi, and Serrette met with Teachey in Gecht's office.  Equinox's 56.1 ¶ 41; Teachey's 56.1 Response ¶ 41.  They told Teachey that his performance was not meeting their expectations, and therefore his employment would be terminated effective that day.  Equinox's 56.1 ¶ 41; Teachey's 56.1 Response ¶ 41.

At some point during the meeting, Gecht showed everyone in the office a video on his phone in which Teachey was seen looking up information for Oben on an Equinox iPad; the video "clearly showed" that Oben and his guest came from the direction of the concierge desk by the managers' offices, rather than from the club entrance.  Teachey Decl. ¶¶ 112–114.  Teachey

explained to Gecht that, because Oben was coming from inside the club rather than from the entrance, he should already have been checked in.  *Id.* ¶ 115.  He suggested that Gecht review another video to find out who was at the front desk when the member and his guest arrived; Gecht refused, saying "[i]t's not important," and stated that he had already informed the General Manager of the East 63rd Street location that Teachey was being terminated.  *Id.* ¶¶ 117–118.

### III.   Teachey's Allegations of Discrimination[4]

Teachey asserts in his declaration that upon his hire, he experienced age-based discrimination, which was chiefly driven by the belief among Equinox's management that he was too old to be a Front Desk Associate.  Teachey Decl. ¶ 24.  He identifies multiple instances of statements regarding his age by other Equinox employees:[5]

- Teachey describes that, during his onboarding process with Mongiovi, when the computer prompted him to change his password his birthdate appeared on the screen, and Mongiovi commented, "Oh, that's your birthday.  I see you're 50."  *Id.* ¶¶ 25–26.  Mongiovi then left the room, and "within a few minutes," he and Eckert passed by the door, looked in at Teachey, and both began laughing.  *Id.* ¶ 27.  Teachey heard Eckert say to Mongiovi, "He's an old queen."  *Id.*

- Teachey states that Mongiovi told him that Hook asked him why he had hired somebody so old as a Front Desk Associate and that Hook said Teachey was too old to be at the front desk.  *Id.* ¶ 28.

- Teachey describes that in or around March 2017, Rivera told him that Equinox had only hired him because, at the time of his application, Equinox was desperate for Front Desk Associates and, absent those circumstances, Equinox would never have hired Teachey because of his age.  *Id.* ¶ 29.  Rivera added that "Equinox need to replace someone right away" and "would have taken almost anybody," and that they've "never had someone as old as [Teachey] at the front desk," stressing that Equinox would not have hired him if they had not been so desperate.  *Id.* ¶ 30.  One of Teachey's coworkers, who was present

---

[4] Teachey also makes various allegations about sex discrimination; Equinox argues that such evidence is not relevant to his age discrimination claim.  The Court need not reach this issue because it concludes that Equinox is not entitled to summary judgment considering only the age-related evidence.

[5] These facts are all drawn from Teachey's declaration; Equinox disputes them.

- during this conversation, asked how old he was; when he did not respond, Rivera said, "He's like 50." *Id.* ¶ 31. Rivera also told Teachey that Hook had told him, referring to Teachey, "I don't know about this guy, he seems a little too old for the front desk," and asked, "Why has he not moved above manager for his age?" *Id.* ¶ 32. Rivera added that Teachey was the oldest Front Desk Associate he had met. *Id.* ¶ 33.

- Teachey states that Mongiovi frequently told him that he was too old to be working at the front desk, and made "snide comments" like, "What do you want to do when you grow up?" *Id.* ¶ 35.

- Teachey describes that on or about June 1, 2017, Mongiovi compared Teachey to Hook, stating, "Craig [Hook] is five years younger than Gregory [Teachey] but looks ten years older." *Id.* ¶ 36.

- Teachey states that Gecht, who took over from Hook as Teachey's direct supervisor in September 2017, treated Teachey worse because of his age, including screaming at him, "You're too f—king old. Aren't you like 50? You shouldn't be f—king up like this at the front desk. What is your f—king problem?" *Id.* ¶¶ 38–39.

## PROCEDURAL HISTORY

Plaintiff filed his complaint against Defendant on November 16, 2018. Dkt. No. 1. The complaint alleges two causes of action: (1) discrimination under the ADEA, and (2) discrimination under NYCHRL. *Id.* ¶ 2. Defendant answered on March 8, 2019. Dkt. No. 15.

On May 15, 2020, Defendant moved for summary judgment. Dkt. Nos. 61–66. Plaintiff filed his opposition papers on July 20, 2020. Dkt. Nos. 73–75. Defendant replied on September 8, 2020. Dkt. Nos. 80–82. The Court held the motion in abeyance and reopened fact discovery on November 6, 2020. Dkt. No. 83. Defendant moved to reopen the motion on February 8, 2021, and the Court took the motion under advisement at that time. Dkt. Nos. 89–90. The Court held oral argument on the motion on April 12, 2022.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for

these purposes if it 'might affect the outcome of the suit under the governing law,'" while "[a]n

issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for

the nonmoving party.'" *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  In determining whether

there are any genuine issues of material fact, the Court must view all facts "in the light most

favorable to the non-moving party," *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir.

2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact

exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted).

If the movant meets its burden, "the nonmoving party must come forward with admissible

evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment."

*Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008).

　　　"[A] party may not rely on mere speculation or conjecture as to the true nature of the

facts to overcome a motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir.

2010) (quoting *Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995)).  Nor may the

non-moving party "rely on conclusory allegations or unsubstantiated speculation."  *F.D.I.C. v.

Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quoting *Scotto v. Almenas*, 143 F.3d 105,

114 (2d Cir. 1998)).  Rather, to survive a summary judgment motion, the opposing party must

establish a genuine issue of fact by "citing to particular parts of materials in the record."  Fed. R.

Civ. P. 56(c)(1)(A); *see also Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).  The non-

moving party must also demonstrate more than "some metaphysical doubt as to the material

facts."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  The

non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading, or on

conclusory statements, or on mere assertions that affidavits supporting the motion are not

credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).

In cases involving claims of discrimination, "an extra measure of caution is merited in [granting] summary judgment . . . because direct evidence of discriminatory intent is rare and such intent must often be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz*, 258 F.3d at 69) (citation omitted). However, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases than to . . . other areas of litigation." *Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) (quoting *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985)). "[T]rial courts should not 'treat discrimination differently from other ultimate questions of fact,'" *id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)), and even in the discrimination context, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb v. Iona College*, 521 F.3d 130, 137 (2d Cir. 2008).

The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex[] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All

statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible."  L.R. 56.1(d).  "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party."  L.R. 56.1(c).

## DISCUSSION

The Court addresses Teachey's ADEA claim before turning to his NYCHRL claim.

## I.     ADEA Claim

The ADEA provides that it is "unlawful for an employer . . . to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's age."  29 U.S.C. § 623(a)(1).  This protection extends to employees who are over the age of forty.  *Id.* § 631(a).

Claims of adverse employment discrimination under the ADEA are governed under the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001).  Under this framework, "a plaintiff must first establish a *prima facie* case of age discrimination.  Once the plaintiff has made out a *prima facie* case, the employer is required to offer a legitimate, nondiscriminatory business rationale for its actions.  If the employer articulates such a reason, the presumption of age discrimination dissolves, and the burden shifts back to the plaintiff to prove that the employer's stated reasons are merely pretextual and that age discrimination was the true reason for the adverse employment action."  *Id.*

### A.     Teachey's *Prima Facie* Case of Discrimination

To establish a prima facie case of age discrimination, a plaintiff must show that (1) he is within the protected age group; (2) he was qualified for the position; (3) he experienced an

adverse employment action; and (4) such action occurred under circumstances giving rise to an inference of discrimination.  *See id.*; *see also Green v. Town of E. Haven*, 952 F.3d 394, 403 (2d Cir. 2020); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010); *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 86–87 (2d Cir. 2015).

Defendant's motion for summary judgment does not contest that Teachey can establish a *prima facie* case.  Rather, it "[a]ssum[es] without conceding" that he can, and instead focuses on the second and third steps of the *McDonnell Douglas* burden-shifting framework, arguing that summary judgment should be granted and Teachey's claims dismissed because "Equinox has articulated legitimate non-discriminatory reasons for terminating his employment, and Teachey has offered no evidence of pretext."  Dkt. No. 62 at 5.  Accordingly, the Court too assumes, for purposes of this motion, that Teachey can establish a *prima facie* case of discrimination.

### B.      Equinox's Legitimate, Nondiscriminatory Rationale

"If a plaintiff successfully presents a *prima facie* case, the employer may rebut it by articulating legitimate and non-discriminatory reasons for the adverse employment action." *Abdu-Brisson*, 239 F.3d at 469.  "A defendant meets his burden if he presents reasons that, 'taken as true, would permit the conclusion that there was a nondiscriminatory reason for the adverse action.'"  *Id.* at 470 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 509 (1993)).

Equinox has articulated legitimate, nondiscriminatory reasons for terminating Teachey's employment.  Dkt. No. 62 at 5.  Equinox asserts that it "terminated Teachey's employment based on . . . two violations of Equinox policies in less than two weeks"—namely, the dress code and guest policy violations.  *Id.* at 7.  That Teachey violated Equinox's dress code policy on January 20, 2018, and received a ROD for that violation, is undisputed.  Equinox's 56.1 ¶¶ 25, 27; Teachey's 56.1 Response ¶¶ 25, 27.  As Equinox asserts, Teachey "was not terminated for violating the dress code policy."  Equinox's 56.1 Reply ¶ 26.  Teachey was terminated after the

second alleged violation—the failure to check in Oben's guest.  Equinox asserts that Teachey was terminated for violating this policy shortly after violating the dress code policy.

The case law is clear that failure to follow company policy is a legitimate, nondiscriminatory reason for termination.  *See Goins v. Bridgeport Hosp.*, 2013 WL 1193227, at *6 (D. Conn. Mar. 25, 2013), *aff'd*, 555 F. App'x 70 (2d Cir. 2014) (holding that "defendants have put forth evidence supporting legitimate nondiscriminatory reasons for [plaintiff's] disciplinary warnings," including "[plaintiff's] failure to follow hospital protocol on the occasions she was disciplined"); *Dawkins v. Witco Corp.*, 103 F. Supp. 2d 688, 697 (S.D.N.Y. 2000) (holding that defendant "has put forward a non-discriminatory basis for Plaintiff's dismissal, namely, that he violated [the company's] safety procedures" and failed to follow the requirements of the company's guidelines).  Thus, Equinox has put forward a non-discriminatory basis for Teachey's termination—that he violated its policies on two back-to-back occasions.

### C.    Teachey's Evidence of Pretext

Although Equinox has proffered a legitimate, nondiscriminatory reason for its decision to terminate Teachey, this alone does not entitle Equinox to summary judgment on Teachey's claims; under the *McDonnell Douglas* framework, the burden shifts back to Teachey to demonstrate that the asserted reason was pretextual.  On the record before the Court, Equinox has not established an entitlement to summary judgment.  A reasonable jury could find that Equinox's asserted reason for Teachey's termination—his back-to-back dress code policy violation and guest policy violation—was pretextual, and that the real reason for his termination was his age.  Equinox's arguments to the contrary are unavailing.

Equinox asserts that Teachey cannot establish pretext for three primary reasons: (1) the "same actor" inference applies, because Mongiovi both hired and fired Teachey within a short period of time and that, therefore, "it would be illogical to conclude that either Mongiovi or

Equinox *considered* Teachey's age when terminating his employment, let alone based the termination decision thereon"; (2) Teachey has not proffered admissible evidence showing that he was treated less favorably than any similarly situated younger Front Desk Associates; and (3) the asserted age-related comments are all either "inadmissible hearsay," "stray remarks," or "neutral factual comments."  Dkt. No. 62 at 7–13.  None of these reasons are persuasive.

First, the "same actor" inference is not available here and, even if it were, it would not entitle Equinox to summary judgment.  The "main thrust" of the "same actor" inference is that "it is difficult to infer that the person who hires an employee in a protected class would 'suddenly develop an aversion to members of that class.'"  *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999) (quoting *Ruane v. Continental Cas. Co.*, 1998 WL 292103, at *8 (S.D.N.Y. June 3, 1998)).  "The 'same-actor' inference is not a necessary inference, it is only a plausible one, and decisions in this Circuit addressing it have warned that its use is not to become a substitute for a fact-intensive inquiry into the particular circumstances of the case at hand."  *Id.*  Several circumstances in this case undercut any inference that, because Mongiovi was one of the managers involved in both the decision to hire Teachey and the decision to fire Teachey, he did not have discriminatory motivation in the firing decision.  The predicate for the same actor inference is that a person who hired an individual notwithstanding his or her membership in a protected class would not have fired him or her because of that same membership.  But there is no evidence here that at the time Mongiovi decided to hire Teachey he knew of Teachey's age or that he was fifty.  The evidence suggests the opposite—as noted above, Teachey testified that, during onboarding (and therefore after his hire), Mongiovi saw his birthday and remarked, "Oh, I see you're 50."  Teachey Dep. at 134:9–17.  A jury thus could readily conclude that before the onboarding process and before Mongiovi looked at the computer, he did not know Teachey's

age—if he did, the comment is nonsensical.  That inference is made all the more powerful by Mongiovi's comments, testified to by Teachey, that Teachey looked good for his age and looked ten years younger than Hook, who was forty-five.  Teachey Decl. at 129:2–4, 136:17–21. Mongiovi's belief that Teachey looked good for his age that could further support the inference that Mongiovi did not realize Teachey's age when Teachey was hired and only learned his age during onboarding, undercutting any "same actor" inference.

Additionally, there is evidence in the record from which a jury could find that Teachey was hired only because of the particular circumstances at Equinox at the moment of his hiring, permitting a jury to conclude that after those circumstances had changed, Teachey's age—which might not have been disqualifying earlier—became disqualifying.  In particular, Teachey testified that Rivera, one of the managers involved in the decision to hire him, "very clearly" told Teachey "that they had never had anyone [his] age at the front desk and they only hired [him] out of desperation, otherwise they wouldn't have hired [him] because of [his] age."  *Id.* at 119:5–9. The evidence suggests an alternate "plausible explanation[] of such 'hire-fire' conduct that may support an inference of discriminatory animus," *Copeland*, 38 F. Supp. 2d at 305—that Teachey was hired *despite* discriminatory animus held by those involved in the decision to hire him because they were "desperate," but that once the temporary need abated, they seized on an excuse to fire him because they did not want someone his age in that position any longer.  A reasonable jury could conclude, based on this evidence, that despite the fact that Mongiovi was involved both in the decision to hire Teachey and the decision to fire Teachey, the decision to fire him was motivated by age-based animus.[6]

---

[6] Additionally, as noted above, the evidence supports that Mongiovi was neither the only person involved in the decision to hire Teachey nor the only person involved in the decision to fire Teachey.

Second, Equinox places great weight on the absence of comparator evidence. Although others who were younger may have committed dress code violations without being disciplined, Teachey was not fired because of a dress code violation and Teachey has not pointed to a similarly situated employee not of his age who violated the guest policy without being disciplined or terminated. There is no evidence one way or the other about persons who violated that policy. However, a plaintiff complaining of discrimination need not necessarily point to a comparator for his or her case to go forward; sometimes people are victims of discrimination for violating a policy no one else has violated or where there is no similarly situated comparator. The absence of comparator evidence is therefore not fatal to Teachey's claims. "As with the first stage of *McDonnell Douglas*, [a plaintiff] is not required to provide evidence that similarly situated [younger employees] were treated differently." *Beck v. Hastings On Hudson Union Free School District*, 365 F.3d 107, 124 (2d Cir. 2004). Even without comparator evidence, adverse employment actions may be found to be discriminatory if there is evidence that the asserted reasons for the actions were pretextual.

Finally, and with respect to Equinox's third point, there is evidence here from which a reasonable jury could find that Equinox's stated reason for firing him was not its real reason and that its real reason had to do with his age. It is undisputed that the first incident would not have been enough for Equinox to fire Teachey; others who were younger had violated the dress code without being fired and a one-time violation of that code was not a firing offense. According to Equinox, what justified and was the basis for Teachey's firing was his violation of the guest policy after he engaged in the dress code violation. But Teachey has offered evidence from which a reasonable jury could find that the alleged guest policy violation was not a reason for his termination. In particular, he has offered evidence that after the incident occurred, he suggested

19

to Eckert that Eckert ask Teachey's on-duty front desk coworkers, who were in their twenties and thirties, whether they had checked in Oben or seen him enter and that Eckert did not do so. Teachey Decl. ¶¶ 118–119.  He also testified at deposition that, when he was terminated, he "did try to explain to them what really had happened," and that "[t]his is not how it happened at all." Teachey Dep. at 109:16–20.   He has supplemented that testimony with evidence from his declaration that, during the meeting in which he was terminated, after he was shown a video on Gecht's phone which depicted Teachey looking up information for Oben on an Equinox iPad, Teachey told Gecht that the video "clearly showed that both Mr. Oben and his guest came from the direction of the concierge desk by the managers' offices and not from the club entrance opposite the front desk" and "explained to Mr. Gecht that . . . based on the available information, Mr. Oben should have already been checked in, as he was already inside the club."  Teachey Decl. ¶¶ 112–115.  He "suggested that Mr. Gecht review another video to find out who was at the front desk at the time that the member and his guest arrived."  *Id.* ¶ 116.  According to Teachey, Gecht replied:  "It's not important."  *Id.* ¶ 117.  A reasonable jury could infer from this statement that Gecht, speaking for Equinox, did not truly care whether Teachey had violated the policy—that was not the basis for Equinox's decision.  He and his co-workers merely seized on the incident as an excuse to justify a decision that they planned to make on the basis of reasons having nothing to do with the January 30 incident.  The inference is further justified by the absence of any evidence reflecting that Equinox did any kind of an investigation into Teachey's conduct on that day.  *Cf. Zahorik v. Cornell University*, 729 F.2d 85, 93 (2d Cir. 1984) (holding, in the Title VII context, that "[d]epartures from procedural regularity, such as a failure to collect all available evidence, can raise a question as to the good faith of the process where the departure may reasonably affect the [adverse employment] decision").

There also is sufficient evidence in the record for a reasonable jury to conclude that the real reason for Teachey's termination was his age.  In particular, the summary judgment record contains examples of comments made to or about Teachey by Equinox's management, including those involved in the decision to terminate him, that a jury could conclude reflected age-based animus.  Equinox asserts that this evidence of age-based animus may help Teachey make out his *prima facie* case, but that he cannot rely on the same evidence at the pretext stage.  However, that argument is clearly incorrect.  As the Second Circuit has held, "[t]o meet his or her ultimate burden, the plaintiff may, depending on how strong it is, rely upon the same evidence that comprised [his] prima facie case, without more."  *Beck*, 365 F.3d at 124.

The evidence supporting an inference that Teachey's termination was based on his age includes that statement made by Mongiovi, after Teachey was hired and during the onboarding process, "Oh, I see you're 50."  Teachey Dep. at 134:9–17.  During Teachey's onboarding, after Mongiovi saw and commented on Teachey's age, Mongiovi then "left the room and, within a few minutes, he and Kyle Eckert, Membership Advisor, passed by the door, looked in at [him] and both began laughing," and he heard Eckert say to Mongiovi, "He's an old queen," Teachey Decl. ¶¶ 25–27.  The evidence also includes Mongiovi's statement made on another occasion, "Greg, whatever you're using, you're looking really good, you know, to be like your age."  Teachey Dep. at 129:1–7.  It further includes that Mongiovi told another employee in front of Teachey that "Greg's like 50" after Teachey did not answer questions about his age, *id.* at 129:10–17; that Mongiovi compared Teachey's age and appearance to that of another coworker by saying that the other coworker is "five years younger than Greg but he looks ten years older," *id.* at 136:8–11; and that Mongiovi told Teachey that he was too old to be working at the front desk and asked, "What do you want to do when you grow up," Teachey Decl. ¶ 35.  It further

includes evidence that Mongiovi repeated negative, age-related comments made about Teachey by other managers to Teachey; he told Teachey that Hook had asked Mongiovi "why had they hired somebody so old at the front desk" and "wasn't [Teachey] a little too old to be at the front desk?"[7]  Teachey Dep. at 116:23–117:5.  The evidence also includes testimony that Gecht, one of Teachey's supervisors and one of the people involved in the decision to terminate his employment, on one occasion "screamed at [him] at the front desk," saying "you're too f—king old.  Aren't you like 50?  You shouldn't be f—king up like this at the front desk.  What is your f—king problem?"  *Id.* at 124:14–21; *see also* Teachey Decl. ¶ 39.

Contrary to Equinox's argument, the age-related comments by Mongiovi and Gecht cannot be simply ruled out as "stray remarks."[8]  The Second Circuit has held that remarks should not "first be categorized either as stray or not stray and then disregarded if they fall into the stray category," but rather the relevant standard is that "[t]he more a remark evinces a discriminatory state of mind, and the closer the remark's relation to the allegedly discriminatory behavior, the more probative the remark will be."  *Tomassi v. Insignia Financial Group, Inc.*, 478 F.3d 111, 115–16 (2d Cir. 2007), *abrogated on other grounds by Gross v. FBL Fin. Servs.*, 557 U.S. 167 (2009).  The remarks in question here, made by those who decided to terminate Teachey's employment, and made throughout the short period of his employment, can reasonably be

---

[7] Defendant argues that this statement is inadmissible hearsay.  Dkt. No. 62 at 10.  However, neither the underlying statement made by Hook to Mongiovi nor the relaying of the statement by Mongiovi to Teachey are being considered for the truth of the matter asserted.  Fed. R. Evid. 801(c); *see also, e.g.*, *Pilgrim v. McGraw-Hill Companies, Inc.*, 599 F. Supp. 462 , 476–77 (S.D.N.Y. 2009) (holding that testimony about discriminatory remarks is "not hearsay because it is offered for the fact that the comments were made—not to prove the truth of their content").
[8] Equinox also argues that some of the age-based comments Teachey testified to are "inadmissible hearsay"; the Court need not reach the admissibility of various second-hand statements because, with the exception of the statement by Mongiovi to Teachey relaying comments he claimed were made by Hook, which is addressed *supra*, the Court does not rely on any of the comments that Equinox argues are inadmissible in this Opinion.

viewed to evince a discriminatory state of mind and are probative of the allegedly discriminatory behavior. Nor can the comments be dismissed as "neutral factual comments." It is true that comments that "merely acknowledge" membership in a protected class "fail to demonstrate bias." *Jalal v. Columbia University*, 4 F. Supp. 2d 224, 236 (S.D.N.Y. 1998). There may be many different reasons why a person may make reference to a person's membership in a protected class without the reference reflecting a discriminatory bias against that person. At the same time, however, it is also the case that "disapproval—and therefore prejudice—may be expressed in highly indirect ways." *Id.* The relevant inquiry, therefore, is whether the comments could be viewed by a reasonable jury to express prejudice on the basis of the protected characteristic; *i.e.*, whether even a facially non-disparaging comment, viewed in context, carries with it implicit disparagement. Here, the remarks, viewed in isolation and particularly when viewed in combination, could reasonably be construed by a jury to reflect age-based animus. It may be, for example, that when Mongiovi stated that Teachey looked good for his age, he intended that as a compliment. It also may have been, and a reasonable jury could conclude that it was, a derogatory comment about Teachey's age—that even though Teachey looked good, he was old (and too old) for the job. The same is true about comments by managers far younger than Teachey about his age that may not even be facially non-disparaging, such as "You're too f—king old," and "What do you want to be when you grow up."

These repeated age-related comments by those involved with the decision to terminate Teachey's employment, coupled with the evidence about the circumstances of Teachey's termination, could reasonably support the inference that the asserted reason for Teachey's termination was pretextual; as a result, Equinox is not entitled to summary judgment. *See Beck*, 365 F.3d at 124–25 (finding, in the Title VII context, that evidence of discriminatory comments

and procedural irregularities was sufficient to rebut asserted nondiscriminatory reasons for an adverse employment action); *Tolbert v. Smith*, 790 F.3d 427, 438 (2d Cir. 2015) (citing *Beck* for the same proposition).

## II.   NYCHRL Claim

Teachey also brings an age discrimination claim under the NYCHRL.  "The Second Circuit has interpreted the amended NYCHRL as establishing a '"one-way ratchet," by which interpretations of state and federal statutes can serve only "as a *floor* below which the City's Human Rights law cannot fall."'"  *Limauro v. Consol. Edison Co. of New York, Inc.*, 2021 WL 466952, at *4 (S.D.N.Y. Feb. 9, 2021) (quoting *Mihalik v. Credit Agricole Cheuvreaux N. Am., Inc.*, 715 F.3d 102, 109 (2d Cir. 2013)); *see also Velazco v. Columbus Citizens Foundation*, 778 F.3d 409, 410 (2d Cir. 2015).  Because the Court denies Equinox's motion for summary judgment on Teachey's ADEA claim, the Court also denies Equinox's motion for summary judgment on Teachey's claim under the broader NYCHRL for the same reasons.  *See, e.g.*, *Dressler v. New York City Dep't of Educ.*, 2012 WL 1038600, at *10 (S.D.N.Y. Mar. 29, 2012); *Hird-Moorhouse v. Belgian Mission to United Nations*, 2010 WL 3910742, at *6 (S.D.N.Y. Oct. 5, 2010).

**CONCLUSION**

The motion for summary judgment is DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 61.


SO ORDERED.

Dated: April 14, 2022
       New York, New York                    _____
                                                    LEWIS J. LIMAN
                                             United States District Judge