M4CAATEAC                    Conference

 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   GREGORY TEACHEY,

 4                  Plaintiff,

 5            v.                              18 CV 10740 (LJL)

 6   EQUINOX HOLDINGS, INC.,

 7                  Defendant.

 8   ------------------------------x
                                             New York, N.Y.
 9                                           April 12, 2022
                                             11:00 a.m.
10
     Before:
11
                        HON. LEWIS J. LIMAN,
12
                                             District Judge
13
                            APPEARANCES
14
     THE LIDDLE LAW FIRM PLLC
15        Attorneys for Plaintiff Teachey
     BY:  EDGAR M. RIVERA
16
     LITTLER MENDELSON, P.C. (NYC)
17        Attorneys for Defendant Equinox
     BY:  EMILY C. HAIGH
18

19

20

21

22

23

24

25

M4CAATEAC                    Conference

1          (Case called)

2          THE COURT:  Good morning.  This is Judge Liman.

3          Are we ready to get started?

4          MR. RIVERA:  Edgar M. Rivera.

5          Good morning, everyone.

6          MS. HAIGH:  Emily Haigh, on behalf of defendant

7    Equinox.

8          THE COURT:  So we're here today for oral argument on

9    defendant's motion for summary judgment.  Let me hear first

10   from the movant party, Ms. Haigh.  Then I'll hear from

11   Mr. Rivera.  I have reviewed the papers.  So I'll have some

12   targeted questions for each of you at the conclusion of

13   argument today.

14         Ms. Haigh, I'll want to you order a copy of the

15   transcript on an expedited basis.

16         Mr. Rivera, during your argument I will give you an

17   opportunity to address the issue of the admissibility of the

18   Shreckly declaration.  You had previously asked or an

19   opportunity to address the admissibility of the declaration.  I

20   had not ruled on that request.  I am going to give you an

21   opportunity this morning to address the admissibility of the

22   declaration.

23         Ms. Haigh, let's start with you.  If you want to

24   reserve some time for rebuttal, you can.  What I've planned on

25   if for each side to have approximately 20 minutes or so for

1    argument.

2              MS. HAIGH:  Certainly, your Honor.  Thank you.

3              All right.  So, Judge Liman, this is a very simple

4    clearcut case.  The question is, Why was Mr. Teachey

5    terminated?  He brings two claims saying that Equinox engaged

6    in unlawful termination of his employment.  The facts couldn't

7    be clearer in this and the most direct evidence is his job

8    description.  Equinox hired Mr. Teachey when he was

9    50-years-old as a front desk associate and that was in 2017.  A

10    year later Mr. Teachey engaged in two back-to-back incidents

11    that violated Equinox's policies and procedures that spoke

12    directly to its brand.  The most important thing to Equinox's

13    business is its brand.

14              First, supervisors witness Mr. Teachey

15    unintentionally, they happen to be looking at surveillance

16    footage and they saw him in street clothes sitting on the front

17    disk of the Equinox entrance at East 61st Street.  As we all

18    know, Equinox's brand is about professionalism and luxury.

19    Anybody in New York City has walked past an Equinox location

20    knows that somebody should not be siting at the front desk in

21    street clothes as the greeter.  It's in the job description.

22              Mr. Teachey received a writeup for that and then

23    within ten days another incident occurred.  Mr. Teachey again

24    was at the front desk and a member of the Equinox club came in

25    with another individual.  Mr. Teachey allowed them to go in and

M4CAATEAC                    Conference

1   he failed to do, again, what was in his job description, which

2   is to sign-in the guest, have them sign a legal waiver of

3   liability while they workout at the facility and then direct

4   them to a membership services agent so that that individual

5   could be brought in as a potential member and it could be

6   discussed whether that person could exercise in the facility

7   that day.

8           THE COURT:  Ms. Haigh, isn't there a disputed issue of

9   fact as to whether it was Mr. Teachey himself who admitted the

10  guest into the club or instead the other individual who is also

11  at the desk who did it?

12          MS. HAIGH:  Yes.  Thank you, Mr. liman.

13          Mr. Teachey comes back to Equinox's legitimate reason

14  about this and says, hey, it wasn't me.  It was a group effort.

15  We all failed.

16          THE COURT:  He says it was Mr. Campbell who did it,

17  that he was not the person who admitted them.  His only role

18  was after the guest, the member and the guest had entered the

19  perimeter of the club that he had the conversation with the

20  member.

21          MS. HAIGH:  Thank you.  So, judge, that was

22  Mr. Teachey's position.

23          Now, of course, the guest was also deposed in this

24  matter and said that Mr. Teachey said, I got you.  Go in.

25  However, irrespective of that, all we care about, your Honor,

1    when it comes to this legal analysis is what was in the minds

2    of the decision makers.  And we know in real time what was

3    happening in the minds of supervisors.  Who did the supervisor

4    immediately go to when they saw this person who, by the way,

5    everybody knows was a frequent flyer to abuse the guest system.

6    Plaintiff testified to that.

7            He immediately goes to Teachey and said, Hey, how did

8    they get in?  Mr. Teachey says, Oh, they're on the floor.

9            I can look at exactly what his response was.  the

10   Supervisor then goes to the floor pulls the person off.  And it

11   probably wouldn't have been a big deal but the fact that the

12   guest then publicly tweets about the incident, files a

13   complaint with Equinox.

14           So what was in the minds of the managers?  The

15   managers then text each other, which is in the evidence.  And

16   in their minds it's Teachey, nothing to do with his age, but

17   Gregory -- excuse my language, your Honor -- fucked everything

18   up.  And the supervisor also said, He lied to me.  He said,

19   They walked right in.  Which caused the supervisor to go on the

20   floor and pull the guest off.  And they thought Gregory let

21   them in and then lied about it.  This is what led to the

22   debacle and this was the second incident within the span of ten

23   days.  Employment ends based on this.

24           Now Mr. Teachey comes back and basically points to,

25   well, I was the youngest front desk associate.  That appears to

M4CAATEAC                    Conference

1    be true.

2              THE COURT:  The oldest front desk.

3              MS. HAIGH:  I'm sorry.  The oldest.  Thank you, sir.

4              And we concede that, this position, the applicants

5    continued to be young.  The individuals who held that position

6    tend to be young.  There's high turnover.  But courts are very

7    clear that that does not make discrimination.  Because you're

8    only one of a certain trade in a workplace, that doesn't mean

9    that discrimination is occurring.  At minimum he reaches his

10   prima facie case with the items he identifies with regard to

11   age.  There is no evidence of pretext in this case.  In fact

12   plaintiff admits at Equinox what occurred occurred.

13             THE COURT:  So, Ms. Haigh, there is evidence, as I

14   understand it, that at the time that the plaintiff is

15   terminated he says to Goetz to -- is that how you pronounce it?

16             MS. HAIGH:  That's one of the supervisors, yes, sir.

17             THE COURT:  He says to Mr. Goetz basically, I didn't

18   do it.  Why don't you look at the tape.  I was not the one who

19   let those people in.  And Mr. Goetz said to him, It's not

20   important.  The decision's already been made.

21             Isn't that evidence enough to get to the jury on the

22   question of that it was not Mr. Teachey's alleged violation of

23   this rule but something else that causes his termination?  In

24   other words, it's not important that whether Mr. Teachey

25   violated rules and let the guest in.  Then how can it not be,

M4CAATEAC                    Conference

1    also be a non contextual legitimate reason for his termination?

2            MS. HAIGH:  Your Honor, what matters is what was in

3    the mind of the decision maker and there is no evidence to

4    suggest that Adam Goetz or anybody else thought that it wasn't

5    Teachey.  Now if every single employee is terminated --

6            THE COURT:  But Mr. Goetz says basically I don't need

7    to look at the evidence.  It's not important whether you did

8    it.  Isn't that a fair inference from Mr. Goetz's comments?

9            MS. HAIGH:  Your Honor, my understanding of Mr. Goetz

10   to the extent of how that occurred is the decision has been

11   made.  We've already looked into it.  In real time Mr. Serreti

12   talked to you.  They pull somebody off.  Complaints have come

13   in.  It was Mr. Teachey's responsibility to check that guest.

14   Mr. Teachey doesn't dispute the fact that he spoke to the guest

15   before they went on the floor.  I think that it's every

16   employee who rebuts the employer's decision and points to

17   somebody else, says it wasn't just me, says that, well, you

18   don't even have a policy about this.  It's just a practice,

19   then employees would be left out in the cold.  An employer

20   acted in good faith if they thought Teachey made the error and

21   to be honest I think the evidence shows that Teachey made the

22   error but irrespective of that, if Mr. Teachey wants to say I

23   didn't, it wasn't me, there is no evidence to suggest that the

24   decision was made it was based on the error.

25           Now at real time with the termination is being

M4CAATEAC                    Conference

1    delivered, I think it's reasonable for a manager to say it

2    doesn't matter.  I don't want to hear your argument on this.

3    You were the front desk associate when these two came in.  It

4    led to a public complaint on Twitter.  It led to your

5    supervisor being reamed by this guest.  It led to a filed

6    complaint.  And by way, I just talked to you ten days before

7    when I saw you in street clothing sitting in the front desk.

8         THE COURT:  Is there evidence in the record as to

9    Equinox's policy, whether Equinox has a policy with respect to

10   investigating allegations of violations of their rules by

11   employees?

12        MS. HAIGH:  Your Honor, I'd have to look into it.  I

13   don't believe that that became a relevant part of this case.

14   Certainly, when it comes to Mr. Teachey and his counsel made a

15   big deal about the whole check-in procedure isn't a written

16   policy, but we pointed to the job description where it

17   explicitly says it.  I don't think this situation needs much of

18   an investigation.

19        THE COURT:  Wouldn't you at least, if you were

20   advising the employer, say to the employer, why don't you talk

21   to the employee and find out whether the employee actually was

22   the one who let the guest in and checked the, failed to take

23   down the information and get the release from the guest?

24        MS. HAIGH:  Your Honor, in real time the supervisor

25   came up to Teachey and asked what had happened, asked how those

M4CAATEAC                    Conference

1    people ended up on the floor. And I'll pull what his response

2    was because plaintiff admits this. Mr. Teachey don't dispute

3    he was the front desk associate at the time. He spoke to the

4    customer. He gave a response and then he allowed them to go

5    in. He didn't say, by the way, have you checked in yet or do

6    you want to use a guest pass for your guest?

7             THE COURT: I understand that but there is a disputed

8    fact as to the actual facts. And Mr. Teachey says when I had

9    that conversation about a guest pass, I was under the

10   understanding that the guest had already signed the release.

11   Mr. Campbell was at the desk.

12            And you make a point and I understand it to say, under

13   employment law it doesn't really matter what actually happened.

14   What matter is what's in the minds of the people who make the

15   employment decision. But you were going to tell me in a moment

16   what was in the minds of those people from the words of

17   Mr. Teachey at the time. So I'll give you the opportunity to

18   do that, or you can do that on rebuttal.

19            MS. HAIGH: Let me see if I can find it really

20   quickly, your Honor.

21            (Pause)

22            MS. HAIGH: Even in plaintiff's statement he admits

23   that the guest approached him to inquire whether he had --

24   reading from his own declaration.

25            THE COURT: The question is, at the time that the

M4CAATEAC                    Conference

1    employment decision was made, you launched into this because

2    you said that you wouldn't have done --

3              MS. HAIGH:  Yes.

4              THE COURT:  -- at the time that the, prior to the

5    employment decision being is there evidence that it was made

6    interview of Mr. Teachey working (inaudible).

7              MS. HAIGH:  I'll see if you can find it immediately

8    for you, sir.

9              Plaintiff admits that Mr. Echert approached him when

10   he realized that the guest was on the floor.  And plaintiff

11   says, I told him.  Approximately 15 to 20 minutes later

12   Mr. Echert approached me to ask whether I had see Mr. O'Brien

13   and his guest standing by the concierge desk.  I told him that

14   I did and they that they had gone upstairs.  He rolled his eyes

15   and said that they were this supposed to see him first.  About

16   ten minutes later Mr. Echert returned looking very irritated.

17   He called me and asked if I had checked in O'Brien and the

18   guest.  I told him I had not.

19             So really, so in Mr. Echert's view, he is the front

20   desk associate.  Why hadn't he checked him in?  He had engaged

21   with a member and allowed them forward.  Mr. Echert then texted

22   another supervisor and summarizes what had occurred.

23             THE COURT:  Is there evidence, Ms. Haigh, that

24   Mr. Teachey was the sole person who had the authority to check

25   them in and that Mr. Campbell did not have that authority?

M4CAATEAC                    Conference

1           MS. HAIGH:  I don't believe so, your Honor.  But in

2      the supervisor's view in real time they are looking to

3      Mr. Teachey who engaged with a member and allowed him in.

4      There is no evidence that age is playing any role in this in

5      real time, including the text between the supervisor.  If there

6      is some type of ageist or animus or that became an issue here,

7      I think that would be in text.  It is not.  It's he F'ed up.

8      He allowed this person to come in and people are upset at

9      Mr. Teachey, the front desk associate, for allowing him in.

10           Also, the member said that Mr. Teachey allowed him in

11      and said "I got you" or words to that effect.  Mr. Teachey is

12      the only person here who is saying, well, it wasn't me.  Maybe

13      it was the other front desk associate.  The member who entered

14      the facility, as well as the supervisors all thought it was

15      Mr. Teachey's fault.

16           THE COURT:  Let me ask you another question.

17           MS. HAIGH:  Yes, sir.

18           THE COURT:  There is evidence that Mr. Monchovi during

19      the on-boarding process there's words to the effect of "I see

20      you're 50", something like that; is that correct?

21           MS. HAIGH:  That's right, your Honor.  I have that

22      identified as one of the one admissible, yes, remarks.

23           THE COURT:  Is there evidence that Mr. Monchovi knew,

24      before the on-boarding process before the decision was made to

25      hire Mr. Teachey, of his age?

M4CAATEAC                    Conference

1        MS. HAIGH:  Your Honor, I believe the full evidence is

2   that he met with Mr. Teachey and hired him.  So to the extent

3   you can visibly identify the approximate age of somebody when

4   you hire but I don't believe there was discussion of age or any

5   document filed showing the birthday.  The comment about 50 was

6   Oh, wow.  You're 50.  You look great for your age.  And that's

7   my understanding of the remark.

8        But Leo, as you identified, sir, there is the same act

9   or inference here which is very strong in our district which is

10  that Leo hired him after meeting him and then was part of the

11  decision to terminate a year later.

12       THE COURT:  You could perhaps draw the opposite

13  inference from that comment.

14       First after all, at the time that Mr. Teachey was

15  hired Mr. Monchovi did not know his age.  Otherwise, why would

16  he have made that comment during the on-boarding process.

17       And second, while you might put benign words on it.

18  You could also equally put some ageist remarks on it.  We don't

19  generally tolerate people making comments about folks' race or

20  age and to make a comment about somebody's age could be read to

21  be a compliment.  It could also be read to suggest that

22  Mr. Monchovi is surprised in a negative way about the age.

23  Isn't that ultimately, that, plus the other comments from

24  Mr. Monchovi, don't they raise triable issues?

25       MS. HAIGH:  Your Honor, so I don't think so.  We did

M4CAATEAC                    Conference

1    brief a lot of case law where benign comments like Oh, you're

2    50.  That's interesting.  You look great for your age, is not

3    evidence of discrimination.  I think Leo Monchovi certainly did

4    meet him and think that he was 23 which is what Mr. Teachey

5    alleges was somewhat the average age of his co-workers.

6          Number two, the most this gets you is a prime facie

7    claim which is why we're here today.  Equinox in response

8    according to the burden shifting framework of these cases is

9    allowed to tell then Mr. Teachey why he was terminated and it's

10   now his responsibility to come up with evidence of pretext,

11   which he has not.

12         THE COURT:  Let me hear from your adversary.  Thank

13   you, Ms. Haigh.

14         MS. HAIGH:  Thank you, sir.

15         THE COURT:  Mr. Rivera.

16         MR. RIVERA:  Thank you, your Honor.

17         Both at the start of defendant's brief and as well as

18   the beginning of the arguments today, they mention that for

19   Equinox brand is the most important thing.  And that brand

20   reflects professionalism, luxury and exclusivity.  And I will

21   argue here today that it will be Equinox to add youth to that

22   list, that part of their brand, part of what they're selling is

23   youth.  The average age for the position of the front desk

24   associate and that's the position that Gregory Teachey, the

25   plaintiff here had held was 27-years-old, and at 50-years-old

M4CAATEAC                    Conference

1    he was significantly older than his colleagues.

2            One issue that hasn't been brought up here but was

3    brought up in reply was why would Equinox have hired him at 50

4    if they have a problem with his age.  Two responses to that was

5    that they simply didn't know.  They didn't know that he was 50

6    until the on-boarding process and the comments that he

7    discussed was evidence of that.  At the very least the jury

8    could infer the conclusion that they didn't know before he was

9    hired.

10           The other reason is with Jonathan Rivera who was an

11   assist and general manager said that at the time of his hiring

12   Equinox was short-staffed at the front desk and they would have

13   literally taken anybody to fill that seat.  Once the temporary,

14   I suppose, staffing issue was corrected, well, now they had no

15   real reason for him and they didn't think that he fit in with

16   their brand that wanted to reflect youth.  He was as I said

17   significantly older than his other colleagues and the managers

18   talked about his age frequently.

19           Another thing that really needs to, attention needs to

20   be brought to, and those are the comments that were made not

21   just by his colleagues but by managers there.  Throughout his

22   employment there and sometimes to his face, sometimes in front

23   of colleagues, he was mocked for his age.  And I don't need to

24   repeat every example here but he was called things like

25   "ancient" and "dinosaur" and they questioned why he was so old

M4CAATEAC                    Conference

1   working with what I imagined what was perceived to be an entry

2   level position.

3              THE COURT:  Let me ask, Mr. Rivera, about one of the

4   foundations.  There's a statement made in Mr. Teachey's

5   declaration that Mr. Monchovi told him that he looked and asked

6   Mr. Monchovi why Mr. Monchovi had hired somebody so old to be a

7   front desk associate and that he was too old to be at the front

8   desk.  It was unclear to me from your submissions whether

9   that's a comment made directly to Mr. Teachey by Mr. Monchovi

10  or by Mr. Hook or what the basis is for that statement.  It's

11  at Paragraph 28 of your claims declaration.

12             MR. RIVERA:  Mr. Monchovi was the person who told

13  Mr. Teachey what he and Mr. Hook had discussed privately.  So

14  Mr. Teachey wasn't present for the conversation between

15  Mr. Monchovi and Mr. Hook where Mr. Monchovi was asked why he

16  would hire somebody so old.  But there is no hearsay issue

17  here.  These are all managers and management level.  So each of

18  their statements find the defendant, Equinox, in and of itself.

19             THE COURT:  Was Mr. Hook involved in the decision to

20  terminate Mr. Monchovi's -- I mean Mr. Teachey's employment?

21             MR. RIVERA:  No, he wasn't.

22             THE COURT:  So what inference would you have me draw

23  from the fact that Mr. Monchovi is relaying that comment?  It's

24  not Mr. Monchovi's comment?

25             MR. RIVERA:  At the most surface level it shows at

M4CAATEAC                    Conference

1  management there, and again, (inaudible) to do with Equinox's

2  brand that he had concerns that they had somebody so old at the

3  front desk being literally the first person that their guests

4  or clients would see upon entrance.  That was important to

5  them.  I don't disagree with defendant's counsel when she said

6  that the brand was important and that these items were

7  professionalism, luxury and exclusivity were important.  They

8  are not being totally honest that youth was part of that.

9          THE COURT:  Let me hear the rest of your argument.  I

10  don't think casting aspersions on the honesty of somebody's

11  response is that helpful to the Court.  Why don't you highlight

12  for me why you think they're triable issues of what you think

13  it creates.

14          MR. RIVERA:  I don't mean to say anything certainly

15  not against defendant's counsel, just against the people who

16  are the antagonists in case as far as plaintiff's position is.

17          Certainly, there are issues that are triable here with

18  respect to Jonathan Rivera's statement.  I think that statement

19  is very important.  It explains why a lot of the inferences or

20  defenses that the defendants posit should not be applied here.

21          For example, the same active theory has come up.  The

22  same active theory (inaudible) because we don't have a

23  situation where we have a one-to-one relationship.  It isn't as

24  if Mr. Monchovi was the only person to hire plaintiff and the

25  only person to fire plaintiff.  With respect to the hiring

M4CAATEAC                    Conference

1    Mr. Monchovi was one of six people and he was the least senior

2    there until a jury could infer that he probably played a small

3    role in the hiring of the plaintiff.  Then when it came to the

4    firing, they have a similar situation where there were three

5    people and Mr. Monchovi was the least senior.

6           So the idea even -- I don't think works here.  But

7    then even if the Court were to, Jonathan Rivera's statement

8    about why they hired him and why it was unusual for them to

9    hire him is important.  It would allow a jury to see passed the

10   same act, for inference or anything that would otherwise

11   suggest that the defendant didn't have a problem with his age.

12          THE COURT:  That doesn't get you completely where you

13   need to be which is to show that the reasons for the stated

14   reasons for your client's termination were -- and as to the

15   stated reasons for your client's termination, isn't it

16   sufficient that Mr. Echert reported to the decision makers that

17   Mr. Teachey had violated the rules regardless of what the

18   underlying true facts are that he might want to establish

19   through this discovery?

20          MR. RIVERA:  That's the next thing I was going to get

21   to with respect to the issue of fact and that has to with the

22   two incidents.  A reasonable juror could find that there was

23   (inaudible) January 20, 2018 incident with plaintiff allegedly

24   wasn't wearing his uniform at the front desk.  This is called a

25   dress code violation and guests had testified during his

M4CAATEAC                    Conference

1   deposition that they were frequent and he doesn't recall

2   terminating anybody for violating it.  So that's one part of

3   pretext and that is if there is a rule.  And my client was

4   given a final warning for that.  Their management has no memory

5   of ever citing someone for it.  It shows he was being treated

6   differently.

7         Another issue there with the January 20, 2018 issue is

8   that they had, Equinox had discretion whether to give him a

9   verbal written or a final warning.  There is nothing to suggest

10  here that the appropriate warning or the appropriate discipline

11  was a final warning.  At the time he had been working at

12  Equinox for nearly a year.  He had no issues in his record.  He

13  hadn't been warned about anything previously.  Management said,

14  as I repeat, that dress code violations are common.  They

15  happen frequently and they didn't (inaudible) anybody for that.

16  And here my client is for the first time it happens, he

17  received a final warning.

18        Based on these facts, the juror could find that it

19  really wasn't about the dress code.  It wasn't about the shirt.

20  It was about something else and plaintiff's position is that

21  something else was --

22        THE COURT:  But, Mr. Rivera, if that's all you had as

23  a clock stop there, you would have no adverse employment

24  action, correct?  And you would have no, that would not be

25  sufficient to support your claim because they had another

M4CAATEAC                    Conference

1    reason why they terminated.

2              MR. RIVERA:  Whether a final warning would depend on

3    facts here but I don't think it, whether it's a matter of law

4    that is actionable because our claim here is based on his

5    termination not based on the warning.

6              So moving on to the second reason, the second reason

7    that the defendant causes (inaudible) 2018 infraction, this

8    whole timeline is rife with disputes.  For example, defendant

9    says that the customer or the patron identified Mr. Teachey as

10   the person who was at the front desk when he entered.  That's

11   just not the case.  during his deposition, the customer said

12   that the person who was at the front desk when he entered had

13   brown hair and was approximately 30-years-old.  That don't fit

14   Mr. Teachey's description at all, who has very gray black hair

15   and in his 50s.  It does however match the description of

16   another employee who was in his 30s and was younger and does

17   have brown hair.  And according to Mr. Teachey was the person

18   at the front desk.  And I think it's important for me to back

19   up a little bit because this is important.

20             At the Equinox entrance or at the front desk, there's

21   an entrance that very clear from the front desk and faces the

22   entrance.  So that way someone at the front desk can see as

23   patrons enter the gym and they can speak with them and interact

24   with them and check them in.  There's also offices on the side

25   of the desk.  And obviously, there's also a space or portal to

M4CAATEAC                    Conference

1    enter the gym.  If you're at the front desk and someone is

2    speaking with you coming from behind or coming from the side of

3    you, meaning that they are not coming -- there is no reason to

4    suggest that they hadn't already been check in.  In other

5    words, the only time that he would -- at the front desk that

6    somebody was properly checked in if he sees them coning from

7    the entrance.  If they are coming from any other part of the

8    space, the presumption would be that they'd already been

9    checked in.  All of this is to say that this whole January

10   30 --

11             THE COURT:  Is there evidence in the record of the

12   layout of Equinox?

13             MR. RIVERA:  Yes.  In the form of Mr. Teachey's

14   declaration there's a detailed description of what he saw and

15   what he didn't see with respect to the, with respect to the

16   layout on January 2018.

17             THE COURT:  You don't have, for example, the floor

18   plan of Equinox?

19             MR. RIVERA:  No, we don't.  I just talked about the

20   beginning of the incident going from the opposite direction to

21   the end of incident.  The incident was caused by Kyle Echert.

22   There wasn't a single complaint by the patron about Gregory

23   Teachey.  The complaint was about how Echert treated him

24   specifically about how Echert had sent him an e-mail

25   essentially accusing him of being a liar, that he was sneaking

M4CAATEAC                    Conference

1    in and disappearing and that he was a chronic offender, that he

2    was constantly using the guest pass system.  And that was

3    really offensive understandably to the patrons.  And that was

4    what provoked his -- like I said, his girlfriend or fiance to

5    make the tweet, as well as make the complaint against Equinox.

6         So this is really about Echert.  Echert was the person

7    responsible for the bad publicity and Echert defending himself.

8    And certainly, a juror could infer this, throw Teachey under

9    the bus by making up a story that Teachey was the only person

10   in front of the front desk, that Teachey had seen the two

11   people enter, and that Teachey had refused or failed to check

12   them in and that Teachey had given information to Echert and

13   when Echert asked what had happened.

14        THE COURT:  Mr. Rivera, Mr. Echert wasn't a decision

15   maker with respect to the termination, was he?

16        MR. RIVERA:  No, he wasn't a decision maker.  But

17   since we're talking about this complaint, he was the person who

18   relayed that information to the decision maker.

19        THE COURT:  Decision makers included Monchovi and

20   (inaudible), right?

21        MR. RIVERA:  Correct.

22        THE COURT:  Aren't they permitted to rely upon the

23   report from Mr. Echert as to what it is that your client did in

24   making an employment decision?  In other words, it may be that

25   they relied to Mr. Monchovi and Mr. Goetz but that doesn't mean

M4CAATEAC                    Conference

1    that Mr. Monchovi and Mr. Goetz made a pre-textural decision.

2            MR. RIVERA:  Well, one -- the argument wasn't made in

3    my opposition but the idea that they are completely scot free

4    simply because they relied upon a subordinate for information

5    isn't the case.  There is a theory of discrimination that

6    somebody -- illegal animus and passed that animus on to

7    somebody who might not for the reason the argument was made in

8    the opposition is that there wasn't the belief that that's

9    really necessary given the remarks by the decision makers

10   showing their own independent animuses, that animus is based on

11   age.  That being said --

12           THE COURT:  Is there evidence that Mr. Echert had an

13   age bias as opposed to an interest in falsely blaming somebody

14   else for what was Mr. Echert's own mistake?

15           MR. RIVERA:  I don't have the citation right now but I

16   believe that there are comments throughout plaintiff's

17   declaration saying that Kyle Echert had made claims --

18   Mr. Echert told Mr. Monchovi that Mr. Teachey was an "old

19   queen" and there were comments made by Mr. Echert about

20   Mr. Teachey's age and they were always in a disparaging way.

21           With that being said, now we're talking about what can

22   a supervisor rely upon or what should a supervisor do.  The

23   question is here is whether a juror could find that age was the

24   reason for his termination.  And generally speaking, an

25   employer is far better off doing some sort of investigation, at

M4CAATEAC                Conference

1    the very least give an appearance that what actually happened

2    in fact finding was important where they terminated somebody.

3    Terminating somebody is as bad as it gets for an employer, and

4    it wasn't important to Equinox.  They said during the

5    termination meeting Mr. Teachey pointed out problems with their

6    theory, that he was the person who had seen the patron's enter

7    and didn't check them in.  The video that he was shown during

8    the determination didn't support the defendant's version of

9    events but it wasn't important for them.  So a reasonable juror

10   couldn't (inaudible) because they had already planned to get

11   rid of them because they didn't have the short staffing any

12   more and he didn't like them because he --

13          THE COURT:  Is there case law, Mr. Rivera, that doing

14   a cursory investigation or superficial investigation combined

15   with some age based or prohibited category based comments is

16   enough to show a pretext?

17          MR. RIVERA:  Your Honor, I couldn't point to a single

18   case right now that would say that.  But again, we are dealing

19   with very fact specific situation and it really comes down to

20   what inference could be drawn from those specific fact. I

21   wouldn't be surprised at all if there were cases where

22   defendants were denied summary judgment where there were

23   remarks made by a decision maker as well as the situation where

24   did the jury felt merited an investigation.

25          THE COURT:  What else should I know about the

M4CAATEAC                    Conference

1   position?

2           MR. RIVERA:  The one thing that didn't come up

3   yesterday was whether or not Mr. Teachey was actually

4   replaced -- this is another dispute of facts that (inaudible)

5   summary judgment of the defendant.  Mr. Monchovi told

6   Mr. Teachey when Mr. Teachey was hired that he was hired to

7   replace a desk worker that had recently separated.  That was a

8   statement by management to Teachey.  A juror could find that

9   they do in fact replace people at the front desk.  So the idea

10  that the staff that Teachey was replaced was somebody younger

11  do could never influence the jury is just incorrect.  A jury

12  could find that they replaced front desk people and that

13  because he was replaced with somebody who was younger was that

14  age was a factor or a motivating factor.

15          THE COURT:  One question is you make a point in your

16  papers of saying that Equinox doesn't have a policy with

17  respect to guests and does that have a guest policy?  But

18  Exhibit E to the Monchovi declaration has a description of the

19  front desk associate position where it does appear to have

20  something that looks like a policy.

21          How can you still maintain the position that there is

22  no desk policy when the job description describes your client's

23  job as including ensuring that all guests complete and sign in

24  multiple guest waiver and making a photocopy of the photo ID?

25          MR. RIVERA:  Well, first, when it comes to a dispute

M4CAATEAC                    Conference

1    of facts here and that is that Mr. Teachey wasn't the person at

2    the front desk when the patron entered and if he wasn't there,

3    then this policy is totally inapplicable.

4            The other is that what Mr. Teachey conveyed to

5    Mr. Echert was not about checking in and making copies of

6    licenses.  Just to answer the question, whether he had seen

7    them and the guest standing by concierge desk, Mr. Teachey said

8    that he did and that they had went upstairs, that was it.  He

9    was, according to Mr. Teachey he was asked a single question,

10   Did he have a guest pass?  And Mr. Teachey answered it.  So the

11   idea that there's a policy on what to do about a guest pass

12   situation, that just simply isn't there.  There is a second

13   policy and plaintiff's version has always been that that policy

14   doesn't, the policy that is applicable here because he was the

15   person at the front disk when the patrons entered.

16           THE COURT:  Would you like to respond with respect to

17   the admissibility of the Shreckly declaration.

18           MR. RIVERA:  Sure.  This is a unique situation.  I am

19   not going to pretend that this has happened to me in my own

20   practice or other practices.  I haven't found any case with

21   really illustrative facts here.  That being said -- that

22   admissible evidence is considered and a declaration signed with

23   conformity with the U.S. Code is admissible evidence and that's

24   what happened here.

25           I understand the back and forth but at the end of the

M4CAATEAC                    Conference

1    day three months before discovery closed, defendants were aware

2    that plaintiff's counsel didn't represent Mr. (inaudible) in

3    any act, whatsoever, and that they were free to contact him,

4    subpoena him in any of the tools that federal procedure have to

5    secure a witness's testimony.  And so for whatever reason that

6    didn't happen but a failure isn't the responsibility of Mr.

7    Teachey.

8             Mr. Teachey doesn't control Mr. (inaudible), has no

9    ability to force him to appear anywhere.  Only the courts can

10   do that.  And if not plaintiff's responsibility either to make

11   a witness available for the purposes of being deposed when

12   again, it's important because we're talking about somebody who

13   is (inaudible) to have to deal with the financial

14   responsibility and he already has the testimony that he

15   believes necessary to move this case forward in order to seek

16   summary judgment.  Plaintiff had a declaration, the declaration

17   is admissible evidence and the declaration says what it says.

18            THE COURT:  Isn't the declaration only admissible as a

19   prior inconsistent statement for impeachment purposes and not

20   as affirmative evidence?  In other words, the declaration to

21   have value there would need to be some showing that

22   Mr. Shreckly would be expected to testify consistent with

23   what's in the declaration?  The evidence appears to be, needs

24   to be to the contrary on this record.

25            MR. RIVERA:  Well, for purposes of summary judgment, I

1    don't think that there's argument that declarations are

2    admissible.  The defendant relies on declarations from it

3    witnesses.  Some of those witnesses would oppose.  Some of them

4    weren't.  It was very standard in motion practice that parties

5    rely on the testimony of witnesses.  And that testimony is used

6    by Court in making a decision.  Whether that person testified

7    consistent with that later at trial, if there is ever a trial,

8    is another question entirely.  If Mr. Schrelly at trial -- and

9    we would expect to call him and serve him a trial subpoena --

10   testified inconsistently with what he swore to under penalty of

11   perjury in a declaration, then plaintiff's counsel very likely

12   impeach him with that declaration, but that's also very

13   standard procedure.

14          Witnesses' testimony often change over time in often

15   very surprising ways.  It depends on what lawyers have to deal

16   with.  It doesn't mean that for the purposes of Rule 56 that a

17   declaration conformity with the rules of the U.S.C. shouldn't

18   be admissible as to something else.  This isn't a situation

19   where we had a declaration that was provided after a deposition

20   and that contradicts that deposition.  There is no competing

21   statement here.  This is just somebody's sworn statement.

22          THE COURT:  All right.  Anything else, Mr. Rivera?

23          MR. RIVERA:  No, your Honor.

24          Thank you.

25          THE COURT:  Ms. Haigh, couple quick rebuttal points?

M4CAATEAC                  Conference

1          MS. HAIGH:  Yes, sir.  I'd address Shreckly first.

2          Your Honor, the evidence presented to you on summary

3     judgment has to be evidence that's reliable and admissible

4     should a finder of fact have to hear this.  And this

5     declaration is not admissible and it's not reliable.  I agree

6     with my colleague, Mr. Rivera, that is it an unusual

7     situation -- represented Mr. Shreckly.  It appears drafted his

8     declaration.  Mr. Shreckly then said we no longer represent him

9     and he's missing.  Mr. Shreckly then wrote to both counsel and

10    asked to reopen discovery and we filed his response which is

11    document 85-1 on the docket, where he essentially says nothing

12    in that declaration is -- I'm not going to testify to anything

13    in that declaration.  It is officially unreliable and cannot be

14    considered.  Even it were considered, the bulk of it is

15    regarding alleged sexual harassment.  To the extent he says

16    anything about age or Mr. Teachey's employment, it's hearsay.

17    It's items like Employee A told Employee B who told me that Leo

18    Monchovi used the word ancient when referring to Mr. Teachey,

19    that cannot be considered on summary judgment.

20          THE COURT:  Assuming that the declaration was

21    admissible, doesn't Mr. Monchovi's statement to Mr. Shreckly

22    constitute an admission?

23          MS. HAIGH:  No, sir.  The alleged comment was not made

24    to Mr. Shreckly.  The quote is, "employees told me that Leo

25    Monchovi said this".  So that's double hearsay.  Maybe one

1   exception applies to number one and then there's no number two

2   exception. And I think this is changing the Court, sir, that

3   there are a lot of earmarks and conclusory allegations about

4   clear marks and you have to whittle it down to what is actually

5   before us which is one comment from Leo Monchovi on on-boarding

6   which says oh, you're 50? I didn't know that. You look great

7   for your age.

8        THE COURT: That's actually not, and maybe it would be

9   helpful to get your responses to it. But there is another

10  comment from Monchovi to the plaintiff where he says, look, had

11  said he was too old to be at the desk, there is a statement.

12  It's pretty general that Monchovi frequently told Teachey he

13  was too old to be working at the front desk and wouldn't want

14  to do what -- and then there is a comment from I don't know how

15  to pronounce his name. The government Exhibit also makes a

16  comment that references age.

17       MS. HAIGH: Regarding to Leo Monchovi, there are two

18  comments. Page 140 of plaintiff's deposition which is

19  controlling here, not his contradictory declaration to the

20  extent he contradict his declaration testimony said that Leo

21  made the two comments. One, you look young for your age. I

22  didn't know you were 50. And then two, what do you want to be

23  when you grow up? Which we address in our briefing.

24       THE COURT: If I were to disagree in terms of whether

25  the deposition is controlling both the declaration, I

1    understand your argument.  But do you have an argument in terms
2    of the Monchovi comment about --
3         MS. HAIGH:  Yes.  The Court has already covered this.
4    Hook was not a decision maker I've have to look back to see
5    whether Teachey says that Monchovi relayed that.  But to the
6    extent he did, again, Hooks is not a decision maker.  I forgot
7    when Hook even theft.  But that is a prior -- mark not in
8    context to the termination, not made by the decision maker.
9         I also want to bring us back to make sure I'm clear
10   that on the day that this all went down, the second incident
11   that caused his termination Cerelli was there with Echert.
12   Cerelli and Echert both go out on the floor and pull these
13   people back.  So it's not like Echert is bringing things to
14   Cerelli.  Cerelli was there in real time and experienced this.
15   Echert then relayed to him, by the way, did you know that a
16   complaint came in and things escalated from there.  But it's
17   not like Echert was out there doing his own thing.  And there's
18   no allegation that Cerelli had made any age-based comment on
19   anything.
20        THE COURT:  Instead of texting your two --
21        MS. HAIGH:  To the extent that that is before you,
22   defendants argument is that that was way before and that was in
23   the context of the termination.  So that's a trademark that
24   arguably gets Mr. Teachey to a prima facie claim.  It does not
25   establish pretext.  As you know, sir, you can't use the same

M4CAATEAC                    Conference

1    evidence to create your claim and then establish pretext.  So

2    the -- makes established the prime facia claim.  We concede

3    that.  We then come back with are legitimate well documented --

4    And again, there is no evidence that we're lying or that

5    anything to do with our decision making was false.

6            THE COURT:  Let me ask you a hypothetical question.

7    Hypothetically a employer, not your client has a bunch of

8    supervisors who make, let's take it out of the age context,

9    wage-based comments.  And then somebody says to the supervisors

10   who made a bunch ever race-based comments over time that the

11   plaintiff has violated a rule.  And the supervisors without

12   doing any investigation, whatsoever, other than just hearing

13   the comments plaintiff has violated the rule, just seized upon

14   that allegation to terminate the plaintiff, I would suppose in

15   your view that constitutes legitimate, if not pre-textural and

16   the jury can't infer from the fact that somebody has acted

17   without any investigation, whatsoever, that they were just

18   looking for an opportunity to get rid of the person based not

19   on the violation but on their previous race-based views.

20           MS. HAIGH:  Your Honor, respectfully, I don't think

21   that that is this case.  There's no allegation that he made any

22   age-based comment, and he is at the heart of this.  Leo

23   Monchovi, I think there is some dispute as to whether his

24   comments made show age animus.  There's comments about age in

25   general and race in general and sexual orientation in general

M4CAATEAC                    Conference

1  doesn't mean that at the discriminatory or that the person

2  animus.

3            With regard to the investigation I don't think that

4  there was no investigation at all.  The supervisor in real time

5  spoke with Mr. Teachey.  They looked at the complaints from the

6  customer.  They then met with Teachey again and terminated his

7  employ and I have to look back at whether the video footage was

8  looked at.  But this is no law that says the employer needs to

9  document the investigation and create witness interviews when

10 it comes to something as simple as this is a back-to-back

11 disciplinary issue within ten days.

12           THE COURT:  What if Mr. Goetz had said to Mr. Teachey

13 it's not important whether you violated this rule.  I don't

14 care whether you violated this rule.  We're going to get rid of

15 you.  And you combine that with evidence that nobody has ever

16 gotten rid of an employee for violation of the -- rule.  Would

17 that be enough if Mr. Goetz had said that?

18           MS. HAIGH:  Your Honor, that changes the facts.  The

19 facts here are, I don't care what you have to say, Mr. Teachey.

20 This is it.  We already looked into this.  I understand you

21 want to point fingers at Gregory but you are the front desk

22 associate.  You spoke to the customer.  And now there's this

23 public Twitter mayhem and I've just spoken to you ten days ago.

24           Now Mr. Rivera wants to put the burden on us to show

25 them a comparator.  That is not our burden.  There is no

M4CAATEAC                    Conference

1   evidence that somebody else back-to-back disciplinary issues

2   that led to a Twitter complaint and an official complaint and

3   was seen wearing street clothes on video surveillance sitting

4   on the front desk within ten days.  There is no comparator of

5   somebody younger who did that and wasn't terminated.  There are

6   lots ever conclusory allegations of oh, young people did this

7   all the time and wore street clothes.  That's not in evidence.

8   There is no individual that Mr. Rivera can identify who engaged

9   in the same conduct.

10          And if I may just touch upon Shapelli?

11          THE COURT:  I think that's covered.

12          MS. HAIGH:  Okay.  Thank you, sir.

13          THE COURT:  And it's just about the noon hour.  If

14  you've got one last point, I'll hear it.  Otherwise, I think

15  the cases been extremely well briefed and well argued.

16          MS. HAIGH:  Okay.  I'll leave it at that.

17          Thank you, sir.

18          THE COURT:  Thank you both.

19          The Court will take this under advisement.  Ms. Haigh

20  all stay on the phone in order to order a copy of the

21  transcript on an expedited basis.

22          MS. HAIGH:  Yes, sir.

23          (Adjourned)

24

25